THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY CHILDS, Defendant-Appellant.

First District (5th Division)   No. 1—90—2065

Opinion filed June 19, 1992.

Michael J. Pelletier, Martin Carlson, Martha V. Sackley, and Christopher M. Murphy, all of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Defendant Larry Childs was indicted for the offenses of murder and armed robbery. He was found guilty of these offenses by a jury and sentenced to concurrent terms of life imprisonment for murder and 60 years for armed robbery. He appeals his conviction and sentence.

Two issues are presented for review: (1) whether the trial court erred in failing to apprise defense counsel of a question submitted by the jury and by sending an *ex parte* communication to the jury through a court bailiff during deliberations and (2) whether the trial court erred in refusing to answer a question from the jury concerning whether defendant could be found guilty of armed robbery and voluntary or involuntary manslaughter instead of murder. For the reasons set forth below, we reverse and remand for a new trial.

On February 4, 1987, Jerry Nichols was killed by a single gunshot wound to the abdomen. Defendant, a neighborhood friend, was arrested and charged with murder. At trial Childs testified that on the afternoon of Nichols' death, Nichols had gone to Childs' home to borrow money. He asked Childs to lend him $50. Nichols had asked Childs to lend him money several times in the past and had always repaid Childs. Childs loaned Nichols the money, and Nichols promised to repay it that same day. Nichols did not repay the loan that day as he had promised. That evening Childs went to the store where Nichols worked as a security guard to collect his money. On the way to the store Childs bought a BB gun from some children playing by a school near his mother's house. Childs further testified that not only was Nichols a much larger man than himself, but also that Nichols had told him he had once killed a man and been in fights with other men. Childs had seen Nichols in a fight and had often seen him in possession of weapons.

When Childs arrived at the store where Nichols worked, the BB gun was in his pocket and he walked back to the meat counter where Nichols stood. Childs told Nichols he needed his money and Nichols then walked toward the cash register. Childs followed him, thinking he was going to repay the money and did not remove the BB gun from his pocket.

The State's principal witness, Ayyash, who was working at the cash register, testified he saw a gun in Childs' hand, that Childs was behind and close to Nichols, and that Nichols, not Childs, said that it was a hold up.

Childs testified that when they arrived at the cash register, Nichols turned around and pointed a gun at him. Childs grabbed the gun barrel and wrestled with Nichols. After wrestling for four or five minutes, they fell over and the gun discharged. Ayyash testified that before the struggle, Childs had tried to open the cash register, but Nichols then turned on him and grabbed him in a bear hug, and the two men struggled to the ground. Nichols fell down first and Childs went down on top of him. Ayyash then testified that he heard a shot but did not see who fired it. Then Childs stood up with Nichols' .38 caliber gun in his hand.

Childs testified that he picked the gun up from the floor because he thought Nichols was alive and did not want Nichols to shoot him. He then went toward Ayyash and asked for the money Nichols owed him. Ayyash testified Childs pointed the gun at him and demanded that he open the cash register, but that he was unable to do so. When Childs could not open the cash register, he slammed it on the floor, broke it open, and removed $30 or $40 from it. Ayyash testified that Childs then walked him over to the other cash register, ordered him to open it, took money from that register as well and then jumped over the counter and ran out of the store. Childs further testified that Nichols appeared conscious, he did not see any blood, and he then returned to his mother's house, where the police arrived about 20 or 30 minutes later and arrested him.

Officer O'Donovan testified that after arriving at the scene and getting a description of defendant from another officer, he and three observers, who knew where a man fitting that description lived, went to defendant's home. As he approached defendant's home, defendant was leaving it, but upon seeing the officer approach, defendant unsuccessfully attempted to get back into the house. Defendant was then arrested and the officers seized a .38 caliber gun that defendant had thrown down as well as cash found on defendant and lying on the porch. Defendant was transported to the police station where he was

identified in a lineup by Ayyash. The .38 caliber gun was later identified as Nichols' gun, which had been used to shoot Nichols.

Detective Horne and Assistant State's Attorney Paula Becker testified for the State that Childs made oral statements to them in which he admitted entering the store to rob it. Childs testified that he made the statement because he was injured, tired and was repeatedly threatened and beaten by Detective Horne. He further testified that he agreed to repeat the prepared statements made by Detective Horne to avoid further beatings. Detective Horne was present during Childs' interview with Paula Becker.

On May 11, 1990, the trial was completed and the court gave the jury its instructions. The jury was given two packets of verdict forms. The first packet included four verdict forms: guilty of murder; guilty of voluntary manslaughter; guilty of involuntary manslaughter; and not guilty of murder, voluntary manslaughter and involuntary manslaughter. The second packet included two verdict forms: guilty of armed robbery and not guilty of armed robbery. No verdict form was submitted as to felony murder.

The jury then began its deliberations. During deliberations the jury posed a question to the court by means of a note given to the bailiff who was attending to the jury. The trial judge, who was having a meal with the State's Attorneys at a restaurant, received a telephone call from the bailiff regarding the jury's note. The note read: "Can the defendant be guilty of armed robbery and voluntary or involuntary manslaughter or must murder be the only option with armed robbery?" The trial judge without consulting the State's Attorneys or defense counsel declined to answer the question and told the bailiff to tell the jury to read the instructions as to the law and to continue to deliberate. The judge then informed the State's Attorneys of the question and answer he gave, but made no effort to contact defense counsel before telling the bailiff how to respond to the jury's question, although defense counsel had given the court a phone number where he could be reached during jury deliberations.

Upon learning about what had transpired, defense counsel objected to the court's failure to contact him about the jury's question and to the content of the court's response to it. The judge replied that he considered the question to be very difficult and confusing.

The jury returned verdicts of guilty of armed robbery and guilty of murder. Defense counsel filed a motion for new trial. At the sentencing hearing, the trial court sentenced Childs to concurrent terms of natural life and 60 years, stating: "I'm going to spare your life. I'm not going to give you the death penalty, but sir, on that murder, fel-

ony murder, I'm going to sentence you to a period in prison for the rest of your natural life without parole ***." Defendant's motion for new trial was denied and this appeal followed.

There is a long line of authority in Illinois that it is error for the trial court to have an *ex parte* communication with the jury after it has retired for deliberations without informing defense counsel. In *People v. Harmon* (1968), 104 Ill. App. 2d 294, 244 N.E.2d 358, the bailiff in response to a "buzz" from the jury room learned from the jury that it desired to ask certain questions. The bailiff indicated that he could not answer its questions and communicated its request to the judge together with a summary of the questions the jury had posed. The judge told the bailiff to tell the jury that it had heard the evidence and was to leave the law up to the judge. The bailiff communicated this to the jury and it resumed deliberations. Neither defendant nor his counsel was brought into court and told of this event until the jury had reached its verdict convicting defendant. The reviewing court determined that it was reversible error for a trial judge to hold any communication with the jury after its retirement to deliberate except in open court, citing *People v. Beck* (1922), 305 Ill. 593, 137 N.E. 454. The reasoning principally relied upon in the earlier Illinois cases is that the accused is entitled to a public trial and communication by the court with the jury outside defendant's presence violates that constitutional guarantee.

There are several supreme court cases holding that the trial court's failure to inform defense counsel of a jury's substantive legal question is grounds for reversal regardless of the correctness of the court's response. *People v. McGrane* (1929), 336 Ill. 404, 168 N.E. 321; *People v. Beck* (1922), 305 Ill. 593, 137 N.E. 454; *Mound City v. Mason* (1914), 262 Ill. 392, 104 N.E. 695; *Chicago & Alton R.R. Co. v. Robbins* (1895), 159 Ill. 598, 43 N.E. 332; *Crabtree v. Hagenbaugh* (1860), 23 Ill. 349.

In the case at bar, both the jury's question to the court and the response to it were outside the presence of the defendant and his attorney. The jury inquired whether the defendant could be found guilty of armed robbery and voluntary or involuntary manslaughter or whether murder must be the only option with armed robbery. The trial judge stated on the record that this question confused him. However, he failed to further instruct the jury or inform defense counsel of the content of the jury's question or the substance of his response until after the jury had reached its verdict. Defendant had a right to know the jury's question so he could know of the source of the jury's

confusion and present his views upon the best manner in which to address the jury's concerns.

■■ The trial court has a duty to clarify an explicit question of law that a jury proffered to the court. In *People v. Harmon* (1968), 104 Ill. App. 2d 294, 244 N.E.2d 358, the appellate court said:

> " '[I]t is not only the right but the duty of the court to reinstruct on any question of law arising from the facts on which the jury say they are in doubt, and on which they ask further instructions. Where the jury make their difficulties explicit, the judge should clear them away with concrete accuracy; and where the question asked is not clear, it is the duty of the court to seek clarification.' " *Harmon*, 104 Ill. App. 2d at 301, 244 N.E.2d at 361, quoting 23A C.J.S. *Criminal Law* §1376, at 1000.

See also *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

Further, the trial court may be required to instruct the jury even if the original jury instructions were proper or, as in the case at bar, agreed to by the parties. *People v. Shannon* (1990), 206 Ill. App. 3d 310, 564 N.E.2d 198; *People v. Flynn* (1988), 172 Ill. App. 3d 318, 323, 526 N.E.2d 579, 583; *People v. Brouder* (1988), 168 Ill. App. 3d 938, 947, 523 N.E.2d 100, 105; *People v. Gathings* (1981), 99 Ill. App. 3d 1135, 425 N.E.2d 1313 (reversible error where jury asked trial court whether it could find defendant guilty on two counts and not guilty on the third count and the court merely referred the jury to the original instructions); *People v. Morris* (1980), 81 Ill. App. 3d 288, 290, 401 N.E.2d 284 (the trial court's admonition to follow the instructions was insufficient as there was no assurance that recourse to the instructions would resolve the confusion); *People v. Land* (1975), 34 Ill. App. 3d 548, 550, 340 N.E.2d 44, 46.

In *Flynn*, the jury submitted two legal questions to the trial judge. The judge told the jury to continue its deliberations. Unlike the instant case, counsel for the State and defense were present and agreed with the court's response. The appellate court reversed, expressing its concern about the danger of permitting the jury to draw its own conclusions on the law to resolve the confusion.

The jury in the present case was left to its own devices to solve the confusion. Childs was charged with murder and armed robbery. The jury by its question concerning whether it could find him guilty of armed robbery and guilty of manslaughter or whether an armed robbery conviction mandated a conviction of murder indicated at least some jurors believed the latter. The trial judge admitted his confusion at the jury's inquiry but nonetheless merely referred it back to the in-

structions and told it to continue deliberations, whereupon the jury returned a verdict of guilty of armed robbery and murder. It is possible the jury thought it had no alternative upon finding defendant guilty of armed robbery.

*People v. Sanders* (1984), 127 Ill. App. 3d 471, 469 N.E.2d 287, presents a fact situation almost identical to the case at bar. In *Sanders*, the defendant was charged with murder and armed robbery. During deliberations the jury asked the following question: "Ruling— if found guilty on one charge, is he, automatically, found guilty of the other charge? In other words, guilty on one and not guilty on the other." *Sanders*, 127 Ill. App. 3d at 473, 469 N.E.2d at 290.

Unlike the instant case, in *Sanders* the court formulated its answer with the defendant and counsel present. It was: " 'In answer to your question, you have two forms of verdict, "Guilty" and "Not Guilty" for each of two charges. You must select one of the two forms of verdict *for each of the two charges*.' (Emphasis added.)" (127 Ill. App. 3d at 473, 469 N.E.2d at 290.) The court of review approved this response, stating that this answer was "a direct and unambiguous response to the question presented, indicating that the jury should choose the appropriate form for the charge independently of the form chosen for the other charge. This information, taken as a whole, would sufficiently dispel any confusion the jury had about whether defendant could be 'guilty on one [charge] and not guilty on the other.' " (*Sanders*, 127 Ill. App. 3d at 474, 469 N.E.2d at 290.) A similar response by the court in the case before us would have been adequate to dispel the jury's confusion.

A long line of Illinois cases cited above leads us to the conclusion that the trial court's communication to the jury after it had begun deliberations was error. We are constrained, however, to consider the State's contention that the error was harmless and authorities cited therefor.

In *People v. Walker* (1982), 91 Ill. 2d 502, 440 N.E.2d 83, the supreme court observed in passing that not every *ex parte* communication by the trial court with a jury after it had begun deliberations would automatically result in reversal of a jury verdict. That this comment was *dicta* is underscored by the fact that the supreme court cited the trial court's *ex parte* communication with the jury together with other errors as grounds for vacating the defendant's death sentence.

The second principal case relied upon by the State to demonstrate that the error was harmless is *People v. Coleman* (1991), 223 Ill. App. 3d 975, 586 N.E.2d 270. It is also not on point because the court

found that defendant's objection to the *ex parte* communication by the trial court with the jury was waived by failure to raise it in a post-trial motion. In *Coleman*, the jury had asked the trial court if it could find the defendant guilty on one offense and not guilty on the other. The trial court, without consulting the attorneys for the State or defendant, sent a note to the jury referring it back to the instructions for the answer. Therefore, the *Coleman* court's observation that this communication was harmless to the defendant because the jury had received a set of instructions agreed upon was *dicta*.

*Coleman* relied heavily upon the supreme court's decision in *People v. Reid* (1990), 136 Ill. 2d 27, 554 N.E.2d 174. In *Reid*, the jury asked a question of the trial court. The court conferred with counsel for the State and for the defendant who agreed that the court should tell the jury to reread the instructions. The court did so. Later the following day, when the jury had asked another question, defense counsel requested the court to provide a specific answer to the question asked the previous day. The State objected and the court refused. The supreme court held that the trial court's action was proper since counsel had input at the time the first question was asked and agreed to the procedure that was followed. The *Reid* court cited *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363, in support of its conclusion that while the jury is entitled to have its questions answered, failure of the trial court to do so does not always require reversal. In *Clark*, the jury indicated to the court that it had a question. The court communicated this to defense counsel by telephone and defense counsel advised the court not to answer any questions. Defense counsel later returned to court at the specific request of the judge. The judge indicated that he would entertain questions by jurors in the presence of all concerned. Defense counsel rejected the court's suggestion. Under such circumstances the supreme court understandably held that the defendant could not complain of the failure of the trial court to answer questions which might have been propounded by the jury during deliberations.

It is a quantum leap to conclude as the *Coleman* court did from the *Reid* and *Clark* holdings that an *ex parte* written response by the trial court to an *ex parte* written question by the jury refusing to answer its question and referring it back to the instructions is harmless error. To the extent *Coleman* can be interpreted as supporting this proposition, we decline to follow it. In *Reid* and *Clark* the trial court sought and was given defense counsel's input on the questions the jury had asked or wished to ask. Therefore, no prejudice occurred.

■ In the instant case, defendant is put to the unenviable task of demonstrating prejudice by an *ex parte* communication not of record between judge and jury outside the presence of defendant and counsel. The difficulty of that task was forcefully put by our supreme court in *Crabtree*. It said:

> "We choose to assume, that what was said and done by the judge *** did not influence the jury in their deliberations, for we think that, independent of its effect upon the jury, the judgment should be reversed, for the simple reason that such an interview took place. If, in this case, no harm was actually done, and for that reason the verdict is allowed to stand, we open the door to the inquiry in all such cases, as to whether the party has been injured by the interview. Such an inquiry should not be tolerated. The policy of the law requires that all the proceedings of the court should be open and notorious and in the presence of the party, so that if he is not satisfied with it, he may take exceptions to it, in the mode pointed out by the law, and not be put to extraneous proof to show that an error has been committed in a secret proceeding, and, in fact, out of court." *Crabtree*, 23 Ill. at 289-90.

Under the circumstances of this case, the State's conclusion that the jury instructions were easily understandable is not readily apparent. The trial judge admitted his own confusion over the jury's question. The question involved one of law and is one that often confuses a jury as the several cases cited above demonstrate. As in *Sanders*, a simple explanation by the trial court of the jury's alternatives would have done much to allay the confusion. Although we have no quarrel with the general proposition that not every *ex parte* communication between judge and jury requires reversal, it does so require in this case. The jury's question was related to a substantive issue; neither defendant nor his counsel was informed of the communication by the court and given an opportunity to suggest an appropriate response to it. The jury's question evidenced confusion and the court made no effort to dispel it.

For the reasons set forth above, we hold that the *ex parte* communication by the trial court to the jury without informing defense counsel was prejudicial error and remand for a new trial.

Reversed and remanded.

MURRAY and GORDON, JJ., concur.