(No. 74024.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. LARRY CHILDS, Appellee.

*Opinion filed May 19, 1994.*

HARRISON, J., concurring.
HEIPLE, J., dissenting.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Margaret J. Faustmann, Fabio Val-

entini and Susan S. Wigoda, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, Deputy Defender, and Martin Carlson, Assistant Appellate Defender, of the Office of the State Appellate Defender, and Martha V. Sackley, Christopher M. Murphy and Mark T. Ostrowski, of McDermott, Will & Emery, all of Chicago, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

On May 11, 1990, a jury in the circuit court of Cook County found defendant guilty of murder and armed robbery. The court sentenced defendant to concurrent terms of life imprisonment for the murder and 60 years for armed robbery. The appellate court reversed defendant's conviction, holding that the trial court's *ex parte* instruction to the jury during its deliberations was reversible error. (230 Ill. App. 3d 993.) We granted the State's petition for leave to appeal (134 Ill. 2d R. 315).

### Background

The charges arose from the fatal shooting of Jerry Nichols on February 4, 1987. The following evidence was adduced at trial. Khaled Ayyash testified that he was serving some customers in his family's grocery at approximately 9 p.m. when he noticed Nichols, who worked as a security guard in the store, and a man whom he identified in a lineup and in court as defendant walking toward him. Defendant was closely behind and to the left of Nichols, and was holding what appeared to be a long, black gun in his hand. Nichols said, "Kelly [Ayyash's nickname] this is a holdup," and defendant told Ayyash to open the cash register. Because the register was not cleared of amounts Ayyash had been ringing up, it would not open. Defendant then unsuccessfully attempted to open the register by

"jamming" on it with his left hand. At that point, Nichols turned and grabbed defendant in a bear hug, and the two men began to wrestle. During the struggle, Nichols tripped and fell onto his back and defendant fell on top of him. Ayyash then heard a shot but did not see a gun being fired. Defendant arose slowly with the gun Nichols carried at work in his hand. Defendant then pointed the gun toward Ayyash and ordered him to open the cash register. When it still would not open, defendant picked it up and threw it to the floor. After emptying the money drawer, defendant walked Ayyash to the store's other cash register, which Ayyash opened. Defendant took the money and then jumped over the counter and fled from the store. When Ayyash checked on Nichols, who lay motionless in the aisle, he noticed the gun he had seen in defendant's hand prior to the struggle on the floor. The gun was later determined to be a "BB" gun. Ayyash picked it up and then called the police. On cross-examination, Ayyash stated that Nichols was 6 feet 2 inches or 6 feet 3 inches and weighed between 220 and 240 pounds. Ayyash reported that $700 had been stolen. A responding police officer testified that Ayyash described the offender as being 28 to 30 years of age, 5 feet 8 inches or 5 feet 9 inches tall and weighing between 130 and 150 pounds.

Officer Patrick O'Donovan testified that some bystanders directed him and his partner to the house where the bystanders thought the offender lived. As O'Donovan approached defendant's house he saw a man (defendant) who fit the description of the offender exiting the enclosed front porch. When O'Donovan identified himself as a police officer, defendant ran back into the porch. As O'Donovan ascended the front stairs he heard glass breaking. When he looked inside the porch area, he saw defendant banging on the front door of the house and the door's glass falling outward. O'Donovan ap-

proached defendant with his revolver drawn and placed him under arrest. Defendant had blood on his face, neck and hands. O'Donovan seized a .38-caliber revolver defendant had thrown down and $128. Defendant was transported to the hospital for treatment of injuries to his hands and face before being questioned at the police station.

An autopsy revealed that Nichols weighed 288 pounds and that he died of a .38-caliber contact gunshot wound in the stomach. It also revealed that Nichols' blood-alcohol level was 0.096.

Detective Ross Horne testified that defendant made a statement to him in which he admitted entering the store to rob it. According to Horne, defendant stated that when he entered the store he saw two men, one white and one black. Defendant put a BB gun into the black man's side and ordered the clerk to open the cash register. As he was hitting the keys of the cash register, the black man drew a weapon and they began struggling. When they fell to the floor, the gun went off. Defendant arose, picked up the gun, told the clerk that he wanted the money and then fled. He injured his hands and face when he broke the glass storm door trying to reenter his house. A few hours later, defendant repeated his oral statement to Assistant State's Attorney Paula Becker in Horne's presence. Defendant declined to make his statement in the presence of a court reporter or to sign a written statement. Becker asked Horne to leave the room for a few minutes, during which time defendant told Becker that he had not been mistreated or threatened by the police.

Defendant testified that he had known Nichols for 10 to 15 years. They saw each other almost every day and often socialized together. Nichols was 6 feet 3 inches tall and weighed approximately 260 pounds; defendant was 5 feet 8 inches tall and 189 pounds. Nichols had

told him he once killed a man and had been in fights with other men. Defendant had witnessed one such fight, and had often seen Nichols with a .38-caliber gun and a knife in his possession.

On the day of the shooting, Nichols came to the house where defendant lived with his parents and asked to borrow $50, promising to return it later that day. Nichols had borrowed money from defendant numerous times and had always repaid the loans. Later that evening, defendant walked to the store where Nichols worked to find out why he had not yet returned the $50. Defendant had been to the store many times in the past. On the way, he saw some children shooting at school windows with a BB gun. He scolded them and then paid them $5 to give him the gun.

When defendant arrived at the store, there were 8 to 10 customers inside. The BB gun was in his pocket when he walked past the cash registers to the counter where Nichols was standing. Defendant told Nichols that he needed the money. Nichols was angry that defendant came to where he worked asking for the money, but defendant persisted that he needed it. Nichols then turned and walked toward the cash register. Defendant followed, believing that Nichols was going to repay him. The BB gun was still in defendant's pocket. When they reached the cash register, Nichols turned around and pointed a gun at him. Defendant grabbed the barrel of Nichols' gun and they began wrestling. Nichols was holding the handle of the gun and defendant was twisting the barrel away from himself so as not to be shot. Despite the disparity in their sizes, defendant was able to "hold his own" for several minutes. As they were struggling, they fell to the floor, and Nichols' gun went off. Defendant picked it up and put it in his pants pocket because Nichols was moving and he was afraid Nichols would shoot him. Defendant then went to the other end

of the counter near the cash register and asked Ayyash for the money Nichols owed him. Ayyash said he had nothing to do with that. Defendant attempted to open the register by hitting on the keys. Finally, he threw the cash register to the floor and removed $30 to $40. Ayyash then opened the second cash register, from which defendant took approximately $60. Before leaving the store, defendant noticed that Nichols seemed to be conscious and did not appear to be bleeding. He assumed that the BB gun fell out of his pocket during his struggle with Nichols.

Defendant returned home but decided to go out again. As he exited the door he saw the police. He tried to reenter the house but the door had locked behind him. He was knocking on the glass when it shattered onto the floor. An officer came up on the porch, pushed him down to the floor and put his feet on defendant's hands while holding a gun to his head. He sustained cuts on his hands and a cut across his eyebrow from the impact when his head hit the floor. Defendant was treated at a hospital emergency room and then returned to the police station where he was placed in an interview room and questioned. Defendant related what had occurred and denied having gone to the store to rob it. Horne accused him of lying, slapped him, and threatened to beat the truth from him. Horne also punched defendant on the side of the head and squeezed his injured hand. Finally, defendant agreed to repeat Horne's version of the shooting to the assistant State's Attorney. Horne was present during the entire interview with the assistant State's Attorney. Defendant testified that he went to the store only to find out why Nichols had not returned his money; he had no intention of robbing it. He was in fear for his life when Nichols pointed the gun at him, and the shooting was an accident.

It was stipulated that the decedent, Nichols, pleaded

guilty to voluntary manslaughter in 1967 and to unlawful possession of a weapon in 1983. It was also stipulated that defendant had past convictions for armed robbery, burglary and possession of burglary tools.

At the close of the evidence, the jury was given instructions which had been agreed upon by the parties. The instructions included two packets of verdict forms. The first packet contained four verdict forms: "Guilty of Murder," "Guilty of Voluntary Manslaughter," "Guilty of Involuntary Manslaughter," and "Not Guilty of The Murder, Voluntary Manslaughter and Involuntary Manslaughter of Jerry Nichols." The second packet contained two verdict forms: "Guilty of Armed Robbery" and "Not Guilty of Armed Robbery." The jury was instructed on murder during the course of a forcible felony, but no verdict form was submitted as to felony murder.

During deliberations, the jury posed a question to the court by means of a note given to the trial court's bailiff. The bailiff telephoned the judge at the restaurant where he was dining with the assistant State's Attorneys and read the note to him. The note read: "Can the defendant be guilty of armed robbery and voluntary or involuntary manslaughter or must murder be the only option with armed robbery?" The trial judge instructed his deputy to give the jury the following response: "You have received your instructions as to the law, read them and continue to deliberate." The judge then informed the prosecutors of the question and the response he gave to it. No effort was made to contact the defense attorneys even though one of them had left a number where he could be reached.

When court reconvened and the judge informed defense counsel of the note and his response, counsel objected to the court's failure to contact him concerning the jury's question and to the content of the court's re-

sponse to it. The trial judge explained his actions, stating:

"That was a very difficult question for me to answer because the instructions include felony murder, murder and commission of armed robbery. They include involuntary, they include voluntary manslaughter and involuntary manslaughter. It was very difficult because I didn't quite know exactly what they were asking. I didn't want to mislead anyone, so my response to the jury was you have received your instructions as to the law, read them and continue to deliberate.

\* \* \*

If I'd given any other answer, \*\*\* I would have contacted both the State's Attorney and defense counsels. I figured as long as I was not responding to that question it wasn't necessary for me to contact—

\* \* \*

In the opinion of the Court, the only answer that was fair to all sides was you have received instructions as to the law, read them, continue to deliberate. You [defense counsel] may not agree with that—

\* \* \*

You have a right not to agree with it.

\* \* \*

The State may or may not agree with it, they have a right to do so. That was the Court's opinion. If I'd given an answer yes or no, I guarantee I would have contacted either one of you."

The jury thereafter returned verdicts of guilty of murder and armed robbery. In imposing concurrent sentences of natural life and 60 years, the trial court stated, "I'm going to spare your life. I'm not going to give you the death penalty, but sir, on that murder, felony murder, I'm going to sentence you to a period in prison for the rest of your natural life without parole." Defendant's motion for a new trial was denied.

The appellate court reversed defendant's conviction, ruling that defendant was prejudiced by the trial court's *ex parte* response to the jury's question, and ordered the

cause remanded for a new trial. The State seeks reversal of that ruling. For the reasons that follow, we affirm the judgment of the appellate court.

Analysis

A criminal defendant has a constitutional right to a public trial, and to appear and participate in person and by counsel at all proceedings which involve his substantial rights (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; Ill. Rev. Stat. 1987, ch. 38, par. 115—4; *People v. Mallet* (1964), 30 Ill. 2d 136, 141-42), so that he may know what is being done, make objections, and take such action as he deems best to secure his rights and for his protection and defense (*People v. Beck* (1922), 305 Ill. 593, 596). A communication between the judge and the jury after the jury has retired to deliberate, except one held in open court and in defendant's presence, deprives defendant of those fundamental rights. *Beck*, 305 Ill. at 596.

For many years, it was a strict rule that any *ex parte* communication whatsoever by the judge or a third person with the jury was plain error, despite that there was no improper motive or effect on the jury (*Crabtree v. Hagenbaugh* (1860), 23 Ill. 289), regardless of the correctness of the response or instruction to the jury, or whether actual prejudice was demonstrated (*People v. McGrane* (1929), 336 Ill. 404, 409; *Beck*, 305 Ill. at 596; *Crabtree*, 23 Ill. at 289-90; see also *Mound City v. Mason* (1914), 262 Ill. 392, 399; *Chicago & Alton R.R. Co. v. Robbins* (1895), 159 Ill. 598, 601-02 (rule equally applicable in civil cases)). The rationale was that it would be unjust to impose upon defendants the burden of discovering and showing actual prejudice from communications which should not have taken place and from which they were improperly excluded.

Since those early cases, the rule has judicially evolved that a jury verdict will not be set aside where it

is apparent that no injury or prejudice resulted from a communication to the jury either by the trial court or a third person outside the presence of the defendant and his counsel. (*People v. Brothers* (1932), 347 Ill. 530, 548; *People v. Tilley* (1952), 411 Ill. 473, 478; *People v. Mills* (1968), 40 Ill. 2d 4, 14; *People v. Walker* (1982), 91 Ill. 2d 502, 516.) Where it is established that an error of constitutional magnitude has occurred, the burden is on the one gaining advantage from the error, rather than the one claiming prejudice, to prove that the error did not contribute to the verdict but, rather, that it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 23-24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 827-28; *People v. Bracey* (1972), 51 Ill. 2d 514, 519-20.) Thus, that portion of the rule enunciated in *Crabtree* and its progeny, *i.e.*, that the burden should not be cast upon a defendant to prove prejudice from an error affecting his substantial rights, has not been abrogated. Because an *ex parte* communication between a judge and a jury deprives a defendant of his constitutional rights to be present at and to participate for his protection in a critical stage of trial, the burden is on the State to prove beyond a reasonable doubt that the error was harmless. See *People v. Briggman* (1974), 21 Ill. App. 3d 747, 752.

A trial court may exercise its discretion and properly decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another. (*People v. Reid* (1990), 136 Ill. 2d 27, 39 (and authorities cited therein).) However, jurors are entitled to have their inquiries answered. Thus, the general rule

is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. (*Reid*, 136 Ill. 2d at 39.) This is true even though the jury was properly instructed originally. (See *People v. Morris* (1980), 81 Ill. App. 3d 288, 290-91.) When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy (*Bollenbach v. United States* (1945), 326 U.S. 607, 612-13, 90 L. Ed. 350, 354, 66 S. Ct. 402, 405; *People v. Caballero* (1984), 102 Ill. 2d 23, 42; see *People v. Harmon* (1968), 104 Ill. App. 2d 294, 301, relying on 23A C.J.S. *Criminal Law* § 1376, at 305 (1989)). If the question asked by the jury is unclear, it is the court's duty to seek clarification of it. (See *People v. Land* (1975), 34 Ill. App. 3d 548, 550-51; *Harmon*, 104 Ill. App. 2d at 301.) The failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error. *E.g., People v. Shannon* (1990), 206 Ill. App. 3d 310; *People v. Bryant* (1988), 176 Ill. App. 3d 809; *People v. Flynn* (1988), 172 Ill. App. 3d 318; *People v. Brouder* (1988), 168 Ill. App. 3d 938; *People v. Tansil* (1985), 137 Ill. App. 3d 498; *People v. Morris* (1980), 81 Ill. App. 3d 288; *People v. Jackson* (1975), 26 Ill. App. 3d 618; *Briggman*, 21 Ill. App. 3d 747; *People v. Kucala* (1972), 7 Ill. App. 3d 1029; *Harmon*, 104 Ill. App. 2d 298.

In the case before us, the jury posed an explicit question which manifested juror confusion on a substantive legal issue. Specifically, the jurors wanted to know whether defendant could be found guilty of armed robbery and either voluntary or involuntary manslaughter, or if a finding of guilt of armed robbery mandated a "guilty of murder" verdict. As noted earlier, the jury was given an instruction regarding murder during the commission of a forcible felony, but no verdict forms

were submitted for felony murder. It would appear that, having been instructed on murder during the commission of a forcible felony, at least some jurors believed that if they found defendant guilty of armed robbery they had no alternative but to also return a verdict of guilty of murder.

Defendant also points out that the jurors were instructed that they were to decide "whether to return a verdict of 'guilty of murder,' 'guilty of voluntary manslaughter' *and* guilty involuntary [*sic*] manslaughter' or 'not guilty of murder, voluntary manslaughter, and involuntary manslaughter.' " (Emphasis added.) Defendant submits that the erroneous inclusion of the word "and" in this instruction may have led the jurors to believe that they were precluded from finding defendant guilty of only voluntary or involuntary manslaughter but, instead, were compelled to find defendant guilty or not guilty of all three offenses.

With regard to the inclusion of "and" in the above-quoted instruction, the State responds that in the preceding instruction the three guilty verdicts were properly listed in the alternative. That instruction advised the jury that "[u]nder the law, the defendant may be found 'guilty of murder', 'guilty of voluntary manslaughter', 'guilty of involuntary manslaughter' or 'not guilty of murder, voluntary manslaughter, and involuntary manslaughter.' " The State thus contends that defendant cannot claim prejudice because the instructions as a whole were complete, proper and agreed to by both sides. The State further argues that the question itself shows that the jurors understood that they could find defendant guilty of only one of the three homicide offenses. The State maintains that, in any event, it is clear from the "overwhelming evidence" in the record that the killing occurred in the course of an armed robbery and, consequently, the only verdict the jury could have reached was that defendant was guilty of murder.

We do not find the State's arguments persuasive. First, whether the instructions were proper and/or agreed to by defense counsel is not the determinative inquiry. The issue is whether the instructions were clearly understandable to the jury. (See *Shannon*, 206 Ill. App. 3d at 317; *Land*, 34 Ill. App. 3d at 550-51.) Apparently, they were not or the jury would not have asked the question it asked. Although the jurors may have understood that they could find defendant guilty of only one of the homicide charges, the written question nevertheless establishes that at least some jurors were confused as to whether they could find defendant guilty of armed robbery and one of the forms of manslaughter *instead* of murder. Further, as the United States Supreme Court reminded in *Bollenbach*, 326 U.S. at 614-15, 90 L. Ed. at 355-56, 66 S. Ct. at 406 (involving unresponsive and erroneous answers to jury questions), upon review of a conviction the question is not whether guilt can be discerned from a record but "whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials ***. From presuming too often all errors to be 'prejudicial,' the judicial pendulum need not swing to presuming all errors to be 'harmless' if only the [reviewing] court is left without doubt that one who claims its corrective process is, after all, guilty."

Moreover, the State's own characterization of the reasons why the trial judge responded as he did belies its assertion that no further instruction was necessary or appropriate. The State submits that the trial judge had a "keen awareness of the complexity of the question which involved the intricate legal issue of felony murder." The State posits that it was due to the "difficulty of the jury's question because the issue of felony murder is a difficult legal concept" that the judge exercised "restraint" in simply referring the jury back to the

instructions it was given. Although the State disputes that the trial judge was "confused" by the question, the judge acknowledged that he "didn't quite know exactly what they were asking." The court's reference at sentencing to defendant's conviction for felony murder, notwithstanding that the jury was not given a verdict form for felony murder, additionally reflects some lack of comprehension of the nature of the jury's confusion. It is because of the judge's perception of the jury's question as difficult, his uncertainty as to the information they sought, and the jury's confusion regarding the possible combination of verdicts it could render that the judge had the obligation to inform all parties of the question, seek clarification of it, allow counsel the opportunity to suggest an appropriate response, and then attempt to dispel the jury's confusion with a clear and specific answer.

As the appellate court noted, similar questions were posed in the contrasting cases of *People v. Gathings* (1981), 99 Ill. App. 3d 1135, and *People v. Sanders* (1984), 127 Ill. App. 3d 471. The jury in *Gathings* asked if it could find the defendants guilty on two counts and not guilty on the third count. The confusion appeared to stem from an instruction which, by the inclusion of the word "and," suggested that the jury would have to find the defendants guilty of all charges if it found them guilty of any one charge. The trial court merely referred the jury back to the original instruction. In reversing the defendants' convictions, the appellate court held that the error in giving the defective instruction was exacerbated by the trial court's failure to answer the jury's question and thereby correct the instructional error. *Gathings*, 99 Ill. App. 3d at 1139.

During its deliberations on charges of murder and armed robbery, the *Sanders* jury asked: "Ruling—if found guilty on one charge, is he, automatically, found

guilty of the other charge? In other words, guilty on one and not guilty on the other." In contrast to *Gathings,* the court, following consultation with counsel and with their agreement, responded, " 'In answer to your question, you have two forms of verdict, 'Guilty' and 'Not Guilty' for each of the two charges. You must select one of the two forms of verdict for each of the two charges.' " On appeal, the court held that the trial court's answer, which advised the jury to choose a verdict form for each charge independent of the form selected for the other charge, was a direct and unambiguous response to the question posed by the jury, and that it was adequate to dispel the jury's confusion on whether the defendant could be found guilty of one charge and not guilty of the other. *Sanders,* 127 Ill. App. 3d at 474.

The State speculates that any additional instruction to the jury in the present case could have been confusing and prejudicial. However, the jury's note establishes that it was already confused and in need of the court's guidance on a matter of law. Correspondingly, the trial judge, by his own admission, did not understand precisely what the jury was asking. Under these circumstances, we disagree with the State that an *ex parte* response that, as the trial judge recognized in his remarks to counsel, amounted to no response to the jury's question was the only proper and nonprejudicial one the court could have given.

The State's position is that the trial court's actions following the jury's inquiry were not improper, nor is there any evidence that the court's response to the question had any impact upon the deliberations, or that defendant suffered any injury as a result of it. The State's position ignores several fundamental principles: (1) a jury is entitled to have its explicit legal questions answered; (2) the trial court has an obligation to seek

clarification of the source of the jury's confusion if the question is unclear, and to then attempt to clarify the matters of law about which the jury has manifested confusion; (3) because jury deliberations are a critical stage of trial affecting substantial rights, a defendant has an absolute right to be informed of any jury question involving a question of law and to be given the opportunity to participate for his protection in fashioning an appropriate response; (4) to sustain the jury's verdict following an improper *ex parte* communication between the judge and the jury, it must be apparent that no injury resulted from the *ex parte* communication; and (5) the burden is on the prosecution, not the defendant, to prove that any error in the giving or the substance of the *ex parte* response to a jury inquiry is harmless beyond a reasonable doubt.

The application of these principles to the facts of this case necessitates reversal of defendant's conviction. The jury posed an explicit question regarding what the State concedes is an "intricate" and "difficult" point of law, and which other cases suggest is not an uncommon source of juror confusion. Although the trial court did not fully understand the question, it made no effort to seek clarification of it. The court deprived defendant of his rights to be informed of the question and to allow his counsel to participate for defendant's protection in the process of determining what would be an appropriate response to it. Rather, the court engaged in an *ex parte* communication with the jury in which the court gave an answer which was tantamount to no answer in that it failed to provide the jury with any guidance for resolving the problem that prompted the question in the first instance. The jury thereafter returned a verdict of "guilty of murder." It is not apparent to us that the manner in which the court dealt with the jury's inquiry was not a factor in the rendering of that verdict. The

State has failed to sustain its burden of proving that the trial court's improper *ex parte* communication to the jury was harmless beyond a reasonable doubt.

Accordingly, we affirm the judgment of the appellate court reversing defendant's conviction and remanding the cause for a new trial.

*Appellate court affirmed.*

JUSTICE HARRISON, concurring:

I agree with the result reached by the majority. I write separately because I disagree with its holding that *ex parte* contacts between a judge and the jury concerning instructions do not always mandate a new trial. For most of this State's history, our court consistently recognized that "it is [reversible] error *** for a trial judge to hold any communication with the jury after their retirement to deliberate upon their verdict, except in open court." (*People v. Beck* (1922), 305 Ill. 593, 596; see *People v. McGrane* (1929), 336 Ill. 404, 408-09.) This was so regardless of what was said or what effect the communication may have had on the jury's deliberations. *Crabtree v. Hagenbaugh* (1860), 23 Ill. 289.

To the extent that more recent cases have deviated from these principles, I would vote to overrule them. In a criminal case, all *ex parte* communications between the judge and jury regarding instructions should automatically result in a new trial, except when the defendant has waived his right to be present. To make the issue turn on considerations of prejudice, as the majority does here, sets an unreasonable standard. If the court is permitted to communicate with the jury in the defendant's absence, the defendant will have no direct knowledge of what was said and done and will be at a disadvantage in proving that something improper took place. (*People v. Tilley* (1952), 411 Ill. 473, 486 (Bristow, J., dissenting).) How, after all, can we expect a defen-

dant to make a full and informed assessment of the effect of events that he had no chance to witness?

Whatever knowledge a defendant has of the improper communication will always be secondhand. In addition, it will normally come from the very party, *i.e.*, the trial judge, who engaged in the offending conduct. As much as we may hope that the court will make a fair and complete disclosure, a criminal defendant should not be left in the position of having to take the judge's word for what occurred.

The prohibition against *ex parte* communications between the judge and jury on the question of instructions is an easy rule to apply. It has no gray areas, no room for interpretation. The logistics of it may put the court to some inconvenience, "but better so than permit a practice so liable to abuse and so much in conflict with the rights of parties litigant." *Chicago & Alton R.R. Co. v. Robbins* (1895), 159 Ill. 598, 601.

> Over one hundred years ago, this court stated:
> "The policy of the law requires, that all the proceedings of the court should be open and notorious, and in the presence of the party, so that if he is not satisfied with it, he may take exceptions to it, in the mode pointed out by the law, and not be put to extraneous proof to show that an error has been committed in a secret proceeding, and, in fact, out of court." *Crabtree v. Hagenbaugh*, 23 Ill. at 289-90.

These principles are no less valid today than they were a century ago. I would therefore affirm the judgment of the appellate court on this basis alone.

JUSTICE HEIPLE, dissenting:

During its deliberations, the jury sent a note to the judge seeking further instructions. Without contacting the defendant or his counsel, the judge responded that the jurors should read the instructions before them and continue to deliberate.

The first question posed is whether this *ex parte* communication from the judge to the jury is *per se* reversible error. It is not. The law is that where there is an *ex parte* communication from a judge to a jury, it is the State's burden to prove that the communication was harmless.

The judge's response added nothing to the jury's storehouse of information. He neither gave nor clarified any issue of fact or law. In short, he did not answer their question. The majority correctly characterizes the judge's response as "an answer which was tantamount to no answer." Where, as here, there was in effect no communication, it was by definition harmless. Thus, the State met its burden.

Justice Harrison, concurring, believes that any *ex parte* communication from judge to jury should be *per se* reversible error. Under the concurring justice's view, the content of the question and the response would be wholly irrelevant. While adoption of this view would be simple of application, it is not the law in Illinois today and should not be so.

The second question is whether the judge had a duty to answer the jury's question. The majority believes that he had such a duty and that his failure to answer the question constitutes reversible error.

The inquiry in this situation should be whether the jury was fully and fairly instructed. It was. Jury instructions were agreed upon by the State and defendant. With the exception of minor agreed changes to four of these instructions, they were all Illinois pattern jury instructions (IPI) read verbatim to the jury. All issues were covered. It is wholly irrelevant that the judge's refusal to answer the jury's question was *ex parte*. The question here is whether the judge's refusal to answer the question was prejudicial to the defendant. The establishment of that burden rests upon the defen-

dant. The majority opinion erroneously assigns this burden to the State and concludes that failure to answer was prejudicial. As a matter of *law*, it was not the State's burden. As a matter of *fact*, it was not prejudicial.

Reference to the facts as set forth in the majority opinion leaves no doubt that the verdicts of armed robbery and murder which were returned were the only correct verdicts. There was error in the giving of the jury instructions, it is true, but that error was in the defendant's favor. That error was the giving of the voluntary and involuntary manslaughter instructions at all. Given the undisputed evidence of the armed robbery, the killing could have been nothing but murder. The giving of these manslaughter instructions was beneficial to the defendant.

It was the trial court's error in the giving of these two instructions, however, which prompted the jury's question, "Can the defendant be guilty of armed robbery and voluntary or involuntary manslaughter, or must murder be the only option with armed robbery?"

The only correct answer to the jury's question would have been, "Murder is the only option with armed robbery." The other choice was not to answer the question and, instead, to simply redirect the jury to the instructions that were already before it. The judge chose the latter option. In doing so, he chose the response most favorable to the defendant.

Since the trial judge's *ex parte* communication to the jury neither added nor detracted from any matter of fact or law that was already before the jury, it was the equivalent of no communication at all. He simply declined to answer the jurors' question and referred them to the instructions already before them. Thus, there was no prejudice arising from the *ex parte* nature of the communication. The judge's response was, in fact,

favorable to the defendant since it did not foreclose the jury from returning a verdict of voluntary or involuntary manslaughter. The latter verdicts would have been an improper result but would have been binding on the prosecution.

The judge did not answer the jury's question. It is more than a stretch to classify this nonanswer as an *ex parte* communication and to conclude therefrom that the defendant suffered prejudice. In failing to answer the jury's question, the judge left open the possibility of a manslaughter verdict, a result which, albeit improper, would have been to the defendant's benefit. Thus, there was no prejudice to the defendant in any respect.

The majority is troubled because the jury manifested confusion on a legal issue during its deliberations and the trial judge refused to offer any further explanations to guide it. Thus, a murder trial has been reversed and a new trial ordered. There is no dispute that the jury was fully and fairly instructed at the conclusion of the evidence. The law was completely before it. When it sought elaboration and explanation, the trial judge simply referred it back to the instructions which it had. This was a complete and perfect response.

The majority opinion in this case subverts the jury-deliberation process. It is yet another case of judicial handwringing in the search for that unreachable goal— perfect justice. The fact of the matter is that juries are often confused. Jurors misperceive facts and misconstrue points of law. Rumor has it that they have even been hung on the matter of electing a foreman. The whole theory of jury trial, however, is that the jury hears the facts; the judge instructs it on the law; and the jury sits down together and works it out. Sometimes this working-out process takes minutes, sometimes hours, sometimes days. Sometimes they never work it out and a new trial has to be ordered. What the process does not contem-

plate, however, is a continuing dialogue between judge and jury with the judge, in effect, participating in the process and leading them along the way. Unfortunately, that is the direction in which the majority is pointing.

Accordingly, I respectfully dissent.