THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROMANCE DENNIS, Defendant-Appellant.

First District (1st Division)   No. 1—92—0731

Opinion filed April 10, 1995.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Romance Dennis (Dennis) was tried as an accomplice to an armed robbery that took place in an alleyway between Chicago Avenue and Springfield Road in Chicago at about 1:30 p.m. on July 15, 1991. He did not deny the robbery happened. He denied that he took part in the robbery.

The evidence required the jury to resolve an issue of accountability. The jury was confused. Twice it asked the trial judge for guidance. The answer it received was incomplete and misleading. Because of that answer, we reverse the defendant's convictions and remand the cause for a new trial.

EVIDENCE

Mario and Greg Perez, the victims of the armed robbery, were self-employed roofers. Their testimony was virtually uncontested by the defendant.

MARIO'S TESTIMONY

Mario and Greg went to the vicinity of Chicago Avenue and Springfield Road on July 15, 1991, in search of a hardware store where they could purchase paint for a job. They drove to this area in Mario's yellow pick-up truck and, while looking for a hardware store, got stuck in an alleyway when a garbage truck that was in front of them stopped and blocked their exit.

Mario stopped his vehicle, turned off the engine, and opened his door while waiting for the garbage truck to move. Through his rear view mirror, he noticed a silver-colored Chevy Citation car enter the alley and pull up behind his truck. Mario identified Dennis as the driver of this car. A person exited the car from the passenger side and Dennis then backed the car into a "T" in the alley. Mario didn't notice anything else until Greg told him that a man was holding a gun to his chest, demanding money.

When he saw the man holding a gun at Greg he "panicked," grabbed the $4 his brother was holding in his hand, jumped out the driver's side door of the truck, and then slammed the door closed. Mario pulled out a pocket knife to "distract" the gunman. When he got the gunman's attention, Greg jumped through the driver's side window. The gunman then took an AM/FM radio/CD player from the floor of the truck and began backing away from the truck. Greg grabbed a barbecue-type fork from the truck and ran after the gunman.

The gunman got back into the silver-colored car, which had turned around without Mario noticing. The car then took off at a

high rate of speed. Mario noted the license plate number on the car and, shortly thereafter, reported the incident and license number to a police officer who had been sitting in a police car on Chicago Avenue.

### GREG'S TESTIMONY

While he sat in his brother's truck waiting for the garbage truck to move, Greg didn't notice the Chevy Citation enter the alleyway. Greg, who had been sitting in the passenger side of the truck, got his first indication that something was wrong when a man with a gun came up to his door and demanded money. He only saw Dennis when he chased the gunman with the barbecue fork after the gunman took the radio/CD player from the truck. The gunman ran to a silver-colored Citation that was parked in a "T" of the alleyway. Greg identified Dennis as the driver of this car, which took off after the gunman entered it.

### OTHER TESTIMONY

The only other State witness was Officer Patricia Warner. Around 1:30 p.m. on July 15, 1991, she and her partner had been driving in a marked police car on Chicago Avenue when they were flagged down by two individuals later identified as the Perez brothers. Officer Warner said the Perez brothers indicated that they had just been robbed and gave a description of the robbers, as well as the license plate number of the car the robbers used.

Using the license number, Officer Warner learned that Romance Dennis was the owner of the vehicle. After obtaining a photograph of Dennis, Officer Warner presented a photo lineup to the Perez brothers and they identified Dennis as the driver of the car. Officer Warner confirmed, however, that the Perez brothers indicated that Dennis' only participation in the crime had been as driver of the vehicle.

On cross-examination, Officer Warner testified that the area where the robbery took place was a well-known "dope spot" and that the house at 3913 West Chicago Avenue was used for drug trafficking. After Dennis was arrested, he agreed to cooperate. While Dennis was still in custody, he was allowed to leave the police station and drive his own car to the home of Ernest Jones. After picking up Jones, Dennis drove to his own home and went inside. At that time Warner and her partner, who had been following Dennis, arrested Jones and then took Dennis back into physical custody.

### DEFENDANT'S TESTIMONY

Dennis, who had been a computer operator at Quaker Oats in

Bridgeview for four years prior to his arrest, testified in his own defense. He did not deny that he drove his Citation on the day in question, nor did he deny that a friend, Ernest Jones (E.J.), committed the armed robbery. Rather, Dennis said that he had driven his girl friend and E.J. to a known drug house located near the alleyway between Harding and Chicago Avenue in Chicago so that E.J. could purchase heroin. Dennis admitted that he used heroin and that he had one burglary conviction in 1989.

Dennis said that he pulled into the alleyway and saw that a garbage truck was blocking the exit. He dropped E.J. off and then saw Mario's yellow truck, which he had seen in that same alleyway on at least three previous occasions, pull into the alley behind him. He saw Mario get out of his truck with money in his hand and walk toward the drug house. Mario and E.J. were almost side-by-side as they approached the drug house.

While E.J. was gone, Dennis backed into the "T" in the alleyway. The next thing Dennis knew, E.J. was running back toward the car, chased by "some guys." E.J. jumped back into the car and said, "Go, Go!" Dennis noticed that E.J. was holding a small Sony radio in his hand. When Dennis asked E.J. what happened, E.J. showed him that he was carrying a revolver in his waistband and admitted that he had stolen the radio.

Dennis testified that when he saw E.J. running he thought it was a drug bust. For that reason, as soon as E.J. got in the car he took off real fast. It was then that he learned that E.J. had taken the radio from the guys who were chasing him.

On cross-examination Dennis was asked if he told the police what he had testified to in court. Dennis stated that he had. When asked if he had first told the police that a friend borrowed his car, Dennis testified that he had told his mother that story and she had told it to the police. He maintained that he always told the police the same story, *i.e.*, that he had gone to Chicago Avenue with E.J., who committed the robbery without his knowledge. Dennis further testified that he told two officers that he went to the area to purchase drugs.

In rebuttal the State called three police officers. The first officer testified that Dennis initially said he wasn't present in the alley and that E.J. borrowed his car. The officer said that Dennis later admitted driving to the alley and dropping E.J. off. All three of the officers testified that Dennis consistently maintained that E.J. had committed the robbery and that he (Dennis) did not know about it until E.J. came running back to the car. Although the officers admitted that a known drug house was located in a house off the alley where the robbery took place, they said that they either did not ask Dennis why he

was in the area or that Dennis never told them he was there so that E.J. could purchase drugs.

## THE JURY'S QUESTIONS

During deliberations, the jury sent the judge a question. It was written on the accountability instruction, Illinois Pattern Jury Instructions, Criminal, No. 5.03 (3d ed. 1992). The question was: "When is the commission of the offense complete?"

The judge called the lawyers to chambers. They discussed a possible response. After a discussion that takes $4^{1}/2$ pages of transcript, the sheriff brought the judge a second note from the jury. The jury asked: "When is the commission of the crime over?"

The judge told the sheriff to tell the jury he was working on an answer to the question and "not to do any deliberations until they get this answer."

After a discussion that takes another $12^{1}/2$ pages of transcript, the judge, relying on a sentence from *People v. Hickman* (1974), 59 Ill. 2d 89, 94, 319 N.E.2d 511, sent the jury this answer:

"You may consider the period of time and the activities involved in escaping to a place of safety."

Defense counsel did not object to the judge's answer. He did say: "If you want to go with the Hickman definition, if that's the law, I hate to think that it is, but I guess that it is ***."

After further deliberations, the jury found the defendant guilty of the armed robberies of the Perez brothers.

In his motion for new trial, the defendant raised the issue of the judge's answer to the jury. He was unsuccessful. The defendant was sentenced to eight years in prison.

## DECISION

There are times when a trial court may use its discretion to refuse to answer a jury's question. Refusal is proper "where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or the other." *People v. Childs* (1994), 159 Ill. 2d 217, 228, 636 N.E.2d 534.

The judge must be especially sensitive to questions that concern law. When the jury's question shows doubt or confusion on a point of law arising from the evidence, the judge generally has the duty to provide some guidance, even though the jury was properly instructed

before deliberations began. *Childs*, 159 Ill. 2d at 229; *People v. Reid* (1990), 136 Ill. 2d 27, 39, 554 N.E.2d 174. Also see *People v. Brouder* (1988), 168 Ill. App. 3d 938, 947, 523 N.E.2d 100.

The judge's answer must be crafted carefully. Once the jury clearly states its difficulties, as the jury did in this case, "the court should resolve them with specificity and accuracy." *Childs*, 159 Ill. 2d at 229.

The failure to answer "or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error." *Childs*, 159 Ill. 2d at 229.

This jury was interested in the defendant's defense. He testified to it and his lawyer argued it: yes, a robbery took place, and yes, he drove E.J. from the scene, but he did not and could not take part in the crime because he did not know about it until it was over.

The issue for the jury, then, was whether the defendant was accountable for E.J's acts. He would be if he shared E.J's criminal intent or if there was a common criminal plan or purpose. *People v. Taylor* (1995), 164 Ill. 2d 131.

The common design can be inferred from the circumstances surrounding the unlawful conduct. *Reid*, 136 Ill. 2d at 62.

Those "circumstances" include such things as presence at the scene of the crime, failure to disapprove of or oppose the crime, close affiliation with the actors after the crime, failure to report the crime, and flight from the scene of the crime. *Reid*, 136 Ill. 2d at 62.

The trier of fact must weigh the relevant "circumstances." The ultimate goal is to determine whether the accused aided and abetted the commission of the crime. But those circumstances, such as flight from the scene, do not change the nature or dimension of the crime.

This robbery ended when the Perez brothers gave up their property. "The offense of robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will." *People v. Gaines* (1981), 88 Ill. 2d 342, 367, 430 N.E.2d 1046.

Flight from the scene does not elongate the offense of robbery. When E.J. got into the defendant's car, the offense was over. Evidence of flight could be used to determine whether the defendant was part of the crime that by then had been completed.

The jurors wanted to know at what point the crime of armed robbery came to an end. They were impatient. They asked the question twice, once writing it on the accountability instruction. They were asking for help on a question of law, the moment when a forcible felony ends. *People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622 (jury's question about when a forcible felony begins raises a point of law).

Instead of guidance on this crucial matter of law, the jury received an answer that was misleading and tantamount to a directed verdict of guilty.

The trial judge's answer—"You may consider the period of time and the activities involved in escaping to a place of safety"—was taken from *People v. Hickman* (1974), 59 Ill. 2d 89, 94, 319 N.E.2d 511. *Hickman* held that a fleeing felon was legally responsible for the killing of a police officer by another police officer during the escape from the scene of the crime the defendant was committing. It had nothing to do with accountability.

■ The judge's answer, when matched with the jury's questions, told the jury the "escape" was part of the armed robbery. Since the defendant testified he learned of the armed robbery as he drove away from the scene, the guilty verdict was made inevitable, even if the jury believed he had no knowledge of the armed robbery before and during its commission.

In this case, as in *People v. Morris* (1980), 81 Ill. App. 3d 288, 291, 401 N.E.2d 284, "a resolution of the jury's confusion was vital to a proper determination of guilt." This is a matter that affects the defendant's "substantial rights." *People v. Oden* (1994), 261 Ill. App. 3d 41, 48, 633 N.E.2d 1385.

The judge's answer to the jury's questions was reversible error. We remand for a new trial.

OTHER ISSUES

Because of the likelihood of a new trial, we will briefly discuss two other issues raised by the defendant.

During the defendant's cross-examination, the prosecutor asked questions about his failure to tell the police he went to the alley to buy drugs. Later, the State offered evidence of that failure. The defendant contends that testimony violated his right to remain silent guaranteed by *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.

■ We do not agree. The defendant testified that he told the police officers he went to the area to buy drugs. The State had the right to impeach that testimony. See *People v. Manley* (1991), 222 Ill. App. 3d 896, 584 N.E.2d 477.

During its rebuttal argument, the prosecution said:

"And if they're lying about him being involved, and he actually did tell the police and everybody about the whole drug situation, then Mario and Greg Perez are lying and are trying to frame Romance Dennis. And Officer Warren [*sic*] is trying to frame Dennis and Officer Sarpalius is lying and is trying to frame him. And

by necessity I guess we are too. There aren't enough criminal(s) out there. There aren't enough real bad guys that we have to manufacture some. Poor little Romance Dennis, somebody just picked his name out of the air and decided we'll nail him 6 months from now in court. Does that make any sense to you whatsoever. This is not a frame up. It's not a set up. It's none of those things."

■ Nothing in the defendant's final argument justified that kind of response. Prosecutors should avoid unfounded and inflammatory argument that places their own credibility in issue. *People v. Roach* (1991), 213 Ill. App. 3d 119, 571 N.E.2d 515.

Because of our determination that the trial judge's answer to the jury was reversible error, we do not stop to weigh the impact of the improper argument.

CONCLUSION

We reverse the defendant's convictions and remand the cause for a new trial.

Reversed and remanded.

CAMPBELL, P.J., and BRADEN, J., concur.