NOS. 4-96-0382, 4-96-0383 cons. 

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

LINDA VAN WINKLE, Individually and ) Appeal from

as Special Administrator of the ) Circuit Court of

Estate of DONALD VAN WINKLE, deceased, ) McLean County

Plaintiff-Appellee and ) No. 95L76

Cross-Appellant, )

v. (4-96-0382) )     

OWENS-CORNING FIBERGLAS CORPORATION, )

Defendant-Appellant and )

Cross-Appellee, )

and )

ILLINOIS CENTRAL RAILROAD COMPANY, )

Defendant. )

----------------------------------------)

MARK HICKS as Special Administrator )    No. 94L308

of the Estate of THELMA HICKS, ) 

deceased, and COLEMAN HICKS, JR.,     )

Plaintiffs-Appellees and )

Cross-Appellants, )

v. (4-96-0383) )

OWENS-CORNING FIBERGLAS CORPORATION, )

Defendant-Appellant and )

Cross-Appellee, )

and ) Honorable

ILLINOIS CENTRAL RAILROAD COMPANY, ) W. Charles Witte,

Defendant. ) Judge Presiding.

_________________________________________________________________

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In March 1995, plaintiff Linda Van Winkle, indi­vid­ually and as special admin­is­tra­tor of the estate of Donald Van Winkle (Van Winkle), sued defen­dant, Owens-Corning Fiberglas Corpo­ra­tion (OCF), alleging OCF con­spired with one or more other manu­facturers of asbestos products (John-Mansville Corpo­ration (J-M), Union Asbestos and Rubber Company (Unarco), and Raybestos-Manhat­tan, Inc. (Raybestos)) to sup­press and not warn of the health hazards of asbestos exposure, thereby causing harm to Van Winkle.  In October 

1995, plaintiffs Mark Hicks (Mark), as special administrator of the estate of Thelma Hicks (Hicks), and Coleman Hicks, Jr. (Coleman), filed an amended complaint against OCF alleging a similar conspira­cy which caused Hicks' death.  The trial court consol­i­dat­ed the cases for trial, and in Novem­ber 1995, a jury re­turned a verdict for plain­tiffs and against OCF.  The jury awarded compen­satory damages of $1.1 million to the Hickses and $2.7 million to the Van Winkles.  The jury also awarded $500,000 in puni­tive damages to the Van Winkles.  

OCF appeals, arguing that the trial court erred by (1) failing to respond ade­quately to a question the jury raised during delibera­tions; (2) taking judi­cial notice of certain facts; (3) excluding certain testimo­ny; (4) refusing to allow certain exhibits to go to the jury; (5) refus­ing to give defendant's special interroga­tories; and (6) giving plaintiffs' nonpattern instructions to the jury.  OCF also argues (1) OCF cannot be held liable unless it joined the con­spiracy before the occur­rence of acts that caused Van Winkle's and Hicks' inju­ries because late-joining conspirators are not liable for prior acts of coconspirators; and (2) the evi­dence was insuf­fi­cient to show a conspiracy.  

Because we agree with OCF's first argument--namely, that the trial court erred in its response to the jury's question--we reverse and remand for a new trial.

I. BACKGROUND

Van Winkle worked from June 1959 until Novem­ber 1959 at a Bloomington, Illi­nois, asbestos plant then owned by Unarco.  It is undis­puted that (1) during 1959, asbestos fibers were re­leased into the air at the plant; (2) some of those fibers came from prod­ucts manu­factured by J-M; and (3) Van Winkle developed mesotheli­oma as a result of his exposure to asbestos at the Unarco plant.  Coleman worked at the Unarco plant from January 1953 until September 1961.  Hicks was exposed to asbestos fibers that Coleman brought home from the Unarco plant on his clothing and person; as a result of her exposure, Hicks developed mesothe­lioma, which caused her death in August 1995.

A. Events (Not Involving OCF) Occurring Prior to 

Decedents' Last Expo­sure  

Much of the evidence presented at trial related to events that took place prior to Van Winkle's and Hicks' last expo­sures to asbestos, in Novem­ber 1959 and September 1961, respec­tively.  Some of that evidence related to events in which OCF was not involved, as follow­s.  Dr. Barry Castleman, plaintiff's expert, testi­fied that (1) during the 1930s and 1940s, J-M and Raybestos attempted to suppress asbestos research conducted by Saranac Laboratory (Saranac); and (2) during the 1930s, J-M and Raybestos tried to prevent Asbestos maga­zine from pub­lishing information regarding asbestosis.  In 1936, Saranac, J-M, Raybestos, Unarco, and other companies (not includ­ing OCF, which did not exist until 1938) reached an agree­ment that the companies would retain control over asbestos research they funded, includ­ing publication deci­sions.  In 1950, the Quebec Asbestos Mining Association (of which OCF was not a member) withdrew its funding for asbestos cancer studies.  In the mid-1950s, the Asbestos Textile Institute (of which OCF was not a member) refused to fund cancer studies.  

B. Events (Involving OCF) Occurring Prior to 

Decedents' Last Expo­sure   

Some preexposure evidence related to events involving OCF but not Raybestos, J-M, or Unarco.  OCF internal memo­ran­da dated Febru­ary 1939 and July 1966 indi­cated an OCF policy of referring all inquiries regard­ing health matters to its legal department.

 Dr. Jon Konzen, a former medical director of OCF, testified that by January 1942, OCF executives knew that airborne asbestos can cause asbestosis.  In a January 1942 inter­nal memo­ran­dum detail­ing OCF's strategy for 1942, an OCF employ­ee pro­posed col­lect­ing arti­cles identi­fy­ing asbestos as a cause of asbestosis as a "weapon-in-reserve," for possible use in negotia­tions with the Asbestos Workers' Union.  

In 1953, OCF began distributing Kaylo, an asbes­tos-contain­ing product manufac­tured by Owens-Illinois.  In October 1956, OCF and Owens-Illinois produced a bro­chure adver­tis­ing Kaylo that de­scribed Kaylo as "nontoxic."  In Septem­ber 1959, OCF pro­duced a similar bro­chure under its own name also describing Kaylo as "non­toxic."  Konzen testified that OCF superiors knew the state­ment regard­ing Kaylo's toxicity was false.

C. Events (Involving OCF) Occurring After Decedents' 

Last Expo­sure 

In 1964, J-M's medical director informed F.H. Edwards, an OCF employ­ee, that J-M planned to place warnings on its shipping contain­ers as of October 1964 but not on the products themselves.  In August 1964, Edwards sent an internal memo to OCF's chief legal counsel, asking whether OCF should "follow the J-M lead" to protect itself from increas­ingly strin­gent health laws and third-party ac­tions.  OCF began label­ing its own ship­ping con­tainers in 1966.  In a Novem­ber 1965 internal memo, Edwards suggested OCF should find a way to prevent Dr. Selikoff (a physician who was attempt­ing to publicize the health effects of asbestos) from affect­ing OCF's sales.  Edwards also noted his "surprise and suspicions" about certain recent state­ments made by J-M's medical director.  

In the late 1960s, an OCF employee and a J-M employee drafted a pamphlet for the National Manu­fac­tur­ers Associ­a­tion (NMA) (an organization to which OCF and Konzen belonged) regard­ing recom­mend­ed health safety practices for handling asbestos-con­taining products.  The pamphlet described asbestos as "poten­tial­ly injurious."  However, the pamphlet men­tioned nothing about the dangers of breath­ing asbes­tos dust or that overexposure could occur without immediate symptoms.  Accord­ing to Castleman, minutes of a meeting of a Novem­ber 1988 cement manufacturers' associ­a­tion (of which OCF was not a member) showed the pamphlet was pub­lished "with avoid­ance of liability in mind" and was not "in­tended *** to inform the workers *** about the haz­ards."  Castleman also testified that the 1966 pamphlet is "probably the strongest evidence" OCF participated in the alleged conspiracy.    

In April 1968, Konzen received an internal memorandum from OCF employee John Vyverberg, regarding a "position paper on fibrous glass," which attached a J-M report describing asbestos health dangers and asked Konzen's view about whether it would be "wise from a liability protection point of view [for OCF] to indi­cate that there might be 'potential haz­ards.'"  That memo also indi­cated OCF's approach to date had been to indicate that "'all medical research to date indi­cates no hazard to health.'"  In March 1970, Konzen advised Vyverberg not to attend an asbestos disease conference because it would be a "giant propa­ganda exercise" and would give "tacit approval to Selikoff." 

A July 1968 internal memorandum informed OCF "top management" that Vyverberg had indicated "much care and consid­eration" went into developing the constitution and bylaws of the Insulation Industry Hygiene Council (the memo called it Selikoff's "brain­child").  The memo noted that the strategy was an attempt to "limit the influ­ence of Dr. Selikoff" and avoid "clinical study of insula­tion workers" within the council.

In April 1970, OCF purchased the Bloomington Unarco plant.  Within two weeks after its pur­chase, Konzen re­viewed the poten­tial health hazards within the plant.  By July 1970, Konzen had re­ceived preliminary survey results.  In an internal memo­randum, Konzen stated:  "This study dem­on­strates imme­diate need for inplant envi­ron­men­tal con­trol of asbes­tos so our em­ployees do not continue to be se­verely ex­posed to air­borne asbestos fiber."  As a result of the indus­tri­al hygiene sur­vey, Konzen sug­gest­ed to OCF superiors that labeling should be done on asbestos prod­ucts.  In response, he received an internal memorandum from OCF employee J.P. Kern, which stated, "Are you saying that 
we
 
have
 to do this now?  I naturally would like to delay this requirement as long as possible."  (Emphasis in original.)  Unarco knew of the dangers of asbestos but did not warn plant workers during its ownership of the plant.  After purchasing the plant from Unarco, OCF did not inform plant workers of any asbestos hazards.  This failure to inform continued during the entire time OCF used asbes­tos at the plant. 

In 1972, an OCF plant manager requested information on asbestos to transmit to Japan.  OCF responded by telling the manager that he was "prob­ing into a very sensi­tive area."  The internal memo also ques­tioned how much infor­ma­tion OCF wanted to release on the subject and forwarded the manager's request to OCF's legal department and Konzen.

In 1978, the Secretary of the United States Department of Health and Human Services publicly announced the risks associ­ated with asbestos exposure.  Konzen and other OCF employ­ees then con­tact­ed eight other asbestos manufac­turers (including J-M) to see how those companies had responded or planned to respond to the an­nounce­ment.  Konzen testi­fied that OCF possessed the necessary medical knowledge to act in response to the an­nounce­ment without contacting other compa­nies.  Konzen also stated that asbestos companies formed a tight-knit communi­ty, and it was common for their medical directors to talk with each other.  

II. OCF'S USE OF FOOTNOTES

Before addressing the merits, we address OCF's use of foot­notes.  Supreme Court Rule 341(a) provides that "[f]ootnotes, if any, shall be used sparing­ly."  155 Ill. 2d R. 341(a).  In addition, Rule 344(b) discourages the use of footnotes in briefs.  155 Ill. 2d R. 344(b).  OCF's brief con­tains 12 footnotes; its reply brief contains 18.  All are single spaced, and many contain sub­stan­tive argu­ment that should be presented in the body of the brief.  This simply cannot be characterized as using footnotes "sparing­ly."  We also note that OCF's reply brief is 27 pages long and probably would have violat­ed the page limita­tion of Rule 341(a) had the 18 foot­notes been integrated into the body of the brief.  See 155 Ill. 2d R. 341(a) (page limitation for reply briefs, if not printed, is 27 pages).  Using footnotes to circum­vent the page limitation violates "the spirit, and probably *** the letter, of the law."  
In re Estate of Marks
, 231 Ill. App. 3d 313, 320, 595 N.E.2d 717, 721 (1992). 

Adherence to the page limita­tions and guide­lines for foot­note usage is not an inconse­quential matter.  
Lagen v. Balcor Co.
, 274 Ill. App. 3d 11, 14-15, 653 N.E.2d 968, 971 (1995).  We agree with the 
Lagen
 court that "Rule 341 represents the Illinois Supreme Court's considered opinion of the format that best facilitates the clear and orderly presentation of arguments."  
Lagen
, 274 Ill. App. 3d at 15, 653 N.E.2d at 971.  In the future, this court may simply disregard footnotes when parties use them in viola­tion of Rule 341(a).  Of course, the best way for a party to ensure that we do not disregard some portion of its brief is to refrain from using any footnotes at all.  Aside from limita­tions imposed by supreme court rules, omitting footnotes consti­tutes better--and more persua­sive--writing. See S. Wilgenbusch, 
Preparing Your Brief:  Whether 'Tis Better to Footnote--Or Not
, 7 App. L. Rev. 39 (1996).  

III. THE TRIAL COURT'S RESPONSE TO THE JURY'S NOTE

OCF first argues that the trial court erred by failing to adequately respond to a question of law the jury raised during deliberations.  We agree.

During deliberations, the jury sent out a written note which read as follows:

"Does a conspiracy 
have
 to be between [OCF] and another company, or can a conspira­cy be within the same company ([OCF]) with the company officers conspiring among them­selves?

We are confused about the meaning of 'one or more parties' in a conspiracy.  Can this mean [OCF] alone, or does it have to be [OCF] and another company?"  (Emphasis in original.)

The court asked OCF's counsel for a suggested response, and counsel stated, in relevant part, as follows:  "Well, I would suggest to the [c]ourt that both questions would be easy to answer.  The answer is obviously, yes, it has to be between OCF and another company as plead[ed].  You cannot conspire with yourself."  Plaintiffs' counsel objected to this suggestion and suggested instead that the court respond that the instructions provided contain the applicable law.  After discuss­ion with counsel, the court responded with a note, stating "[t]he in­struc­tions which the [c]ourt has provid­ed contain the law appli­ca­ble to these cases.  Please refer to your instruc­tions."

In 
People v. Childs
, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539 (1994), the supreme court addressed a trial court's response to a jury question and wrote the following:

"A trial court may exercise its discre­tion and properly decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would poten­tially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another.  [Cita­tion.]  However, jurors are entitled to have their inquiries answered.  Thus, the general rule is that the trial court has a 
duty to provide instruction to the jury where it has posed an explicit question or requested clar­ification on a point of law arising from facts about which there is doubt or confu­sion.  [Citation.]  This is true even though the jury was properly instructed originally.  [Citation.]  When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy [citations].  ***  The failure to answer or the giving of a response which provides no answer to the par­ticu­lar question of law posed has been held to be prejudicial error."

The supreme court viewed the question the jury submit­ted to the court in 
Childs
 as constituting "an explicit question which manifested juror confusion on a substantive legal issue."  
Childs
, 159 Ill. 2d at 229, 636 N.E.2d at 540.  In our opinion, the question asked here constituted the same thing.  
Although 
Childs
 was a criminal case, we deem that distinction irrelevant and hold that the supreme court's analysis in 
Childs
 
applies fully to civil cases as well.  

The jurors here asked an 
explicit
 question:  "Does a con­spir­a­cy 
have
 to be between [OCF] and another compa­ny, or can a con­spira­cy be within the same company ([OCF)] with the company officers con­spiring among them­selves?"  (Empha­sis in original.)  This ques­tion is no less explicit than the question asked in 
Childs
,  whether the defen­dant "could be found guilty of armed robbery and either voluntary or involun­tary manslaughter, or if a finding of guilt of armed robbery mandated a 'guilty of murder' verdict."  
Childs
, 159 Ill. 2d at 229, 636 N.E.2d at 540.

The jurors in this case 
specifi­cally
 expressed their con­fusion regard­ing whether "one or more parties" in a conspiracy could mean OCF alone.  Plain­tiffs point out the court had earlier (and correctly) in­struct­ed the jury that--for a conspir­acy to exist--OCF had to agree with another company.  Also, the issues in­struc­tion identified those other compa­nies.  Howev­er, as the court in 
Childs
 wrote, "[W]hether the instruc­tions were proper *** is not the determina­tive inquiry.  The issue is whether the instruc­tions were clearly understandable to the jury."  
Childs
, 159 Ill. 2d at 231, 636 N.E.2d at 540.

Further, the jury's question here involved a substan­tive legal issue--namely, the elements of a civil con­spira­cy.  In 
Adcock v. Brakegate, Ltd.
, 164 Ill. 2d 54, 62, 645 N.E.2d 888, 894 (1994), the supreme court held that a civil con­spir­a­cy con­sists of a combi­na­tion of 
two or more persons or entities for the purpose of accomplish­ing by some con­cert­ed action either an unlawful purpose or a lawful purpose by unlawful means.   Howev­er, a civil conspira­cy cannot exist between a corporation's own officers or employees.  See 
Salaymeh v. Interqual, Inc.
, 155 Ill. App. 3d 1040, 1044, 508 N.E.2d 1155, 1158 (1987); 
Bonanno v. La Salle & Bureau County R.R. Co.
, 87 Ill. App. 3d 988, 995, 409 N.E.2d 481, 486 (1980).   According­ly, because the jury's ques­tion here consti­tuted "an explic­it ques­tion which mani­fest­ed juror confu­sion on a substan­tive legal issue," we hold that the trial court abused its discre­tion in its re­sponse to the jury's written question--which was, in effect, no response at all.

Additionally, in our opinion, the jury's ques­tion of law con­cerned a potentially dispositive issue.  Plain­tiffs intro­duced into evidence several 
internal
 memoran­da between OCF personnel in support of their claim that OCF con­spired with other asbestos companies.  OCF argued at trial that a con­spir­a­cy cannot exist when companies merely "acted similarly but indepen­dently of one another without agree­ment" and insuf­fi­cient evi­dence existed to show that OCF had con­spired with 
other
 asbes­tos compa­nies.  Thus, it was criti­cal to OCF's defense that the jury under­stand that a con­spiracy could not exist among OCF's officers.  Given the consid­erable impor­tance of this issue to OCF's defense, we conclude that the trial court's error in responding to the jury's question caused substan­tial prejudice to OCF and requires rever­sal.

In so concluding, we note that the better practice would have been for OCF's counsel to have provided the trial court with a written draft of the specific response counsel wanted the court to give the jury, just as counsel provides a written proposed instruction during the jury instruc­tion conference.  Supreme Court Rule 239(c) requires parties to submit proposed jury instructions in writing so that the record shows exactly the parties' respective positions on how the jury should be instructed.  134 Ill. 2d R. 239(c).  We should require nothing less when the jury raises a question during delibera­tions, requiring the court to decide how to respond to--that is, to instruct--the jury.  Indeed, in the midst of jury delibera­tions after a vigorous­ly contested trial, a question from the jury deserves as much--if not more--thoughtful consider­ation as did the original instruc­tions.  Accordingly, we hold that when jurors raise a question during deliberations, counsel must submit--in writing--the specific response counsel wants the court to give the jury.  Because we are pronouncing a new rule, we believe it is only equitable that we apply it prospective­ly.  See 
Aleckson v. Village of Round Lake Park
, 176 Ill. 2d 82, 86, 679 N.E.2d 1224, 1226 (1997) (the issuing court itself may expressly state that its decision will be applied prospectively only); see also 
Torres v. Walsh
, 98 Ill. 2d 338, 353, 456 N.E.2d 601, 608 (1983).  We also note that, in the present case, OCF's counsel's failure to submit a written draft of OCF's proposed specific response to the jury's question does not consti­tute waiver because--in addition to the fact that, prior to this point, no case law or rule existed so requir­ing--the record shows (1) the court clearly understood OCF's sugges­tions; and (2) the jury's questions were so well stated that an appropri­ate response to the jury's note would have been the following:

"The court has received your note in which you ask two questions:  (1) [Jury's first ques­tion]; and (2) [Jury's second ques­tion].  The an­swer to your first question is 'the con­spir­a­cy has to be between OCF and another compa­ny,' and the answer to your second ques­tion is '"one or more par­ties" in a con­spira­cy means OCF and anoth­er compa­ny.'"

IV. ISSUES ON REMAND

OCF raises several other issues likely to arise on remand.   

 

A. Late Entry by Coconspirator

OCF argues that even if sufficient evi­dence existed that it ultimately joined the alleged con­spir­a­cy, OCF still may not be held liable unless it joined 
before
 the acts which caused plain­tiffs' injuries.  OCF contends that a late-joining conspirator is not liable for any acts commit­ted by coconspir­a­tors 
before it joins the conspira­cy.  In re­sponse, plain­tiffs cite 
a statement appearing in Illi­nois Law and Prac­tice that "every con­spirator is liable for all of the acts of each of his co-conspir­ators done in fur­ther­ance of the objects of the conspiracy committed before or after his entry into the conspira­cy."  11 Ill. L. & Prac. 
Conspir­acy
 §16, at 150 (1981).  We do not agree with either conten­tion.

Although we believe it unfair to hold a late-joining conspirator responsible for 
all
 prior acts of its cocon­spira­tors simply because it ultimately joined the ongoing civil conspira­cy, it does 
not
 follow that a late-joining con­spir­a­tor is 
never
 respon­sible for prior acts of its cocon­spira­tors.  In 
Page v. Keeves
, 362 Ill. 64, 74, 199 N.E. 131, 135 (1935), the supreme court, consider­ing a conspiracy to defraud an individual of her real estate, wrote the following:

"Where one assists in the commission of a wrongful act against another, or 
with
 
knowl­edge
 
approves
 
of
 
it
 
after
 
it
 
is
 
done
, if done for his benefit, and he avails himself of the fruits of such improper conduct, he is liable in the same manner as if he himself had com­mit­ted the same wrongful act."  (Emphasis add­ed.)

Fur­ther, we find instructive the decision in 
Havoco of Ameri­ca, Ltd. v. Shell Oil Co.
, 626 F.2d 549, 554 (7th Cir. 1980), in which the court wrote, "a co-con­spira­tor who joins a con­spira­cy, 
with
 
knowl­edge
 
of
 
what
 
has
 
gone
 
on
 
before
 and with an intent to pursue the same objec­tives" (emphasis added) may be held respon­sible for the prior acts of its coconspira­tors.    

Consistent with the views expressed in 
Page
 and 
Havoco
, we con­clude that a party who, with 
knowledge
 
and
 
approval
 of the prior acts of its coconspirators, joins a preexist­ing civil con­spir­a­cy--by satisfying the elements of civil conspiracy as set forth in 
Adcock
--is liable for those prior tor­tious acts of its coconspirators.

This conclusion is not inconsistent with the supreme court's decision in 
Adcock
, which dis­cussed the ele­ments neces­sary to state a cause of action for conspiracy and held, in relevant part, as fol­lows:

"Once a defendant knowingly agrees with an­other to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act commit­ted in furtherance of the conspiracy, wheth­er such tortious act is intentional or negli­gent in nature."  
Adcock
, 164 Ill. 2d at 64, 645 N.E.2d at 894-95.

The supreme court in 
Adcock
 did not address whether a late-joining conspirator may be liable for prior acts of its coconspirators. 
 
 In light of our conclusion that late-joining con­spir­ators are liable for prior tor­tious acts only when it is proved they knew and approved of those prior acts, we hold that, on remand, to the extent plain­tiffs allege that OCF joined the conspiracy after acts that caused Van Winkle's and Hicks' injuries, they must present evi­dence that OCF knew and ap­proved of the prior acts of the other asbestos companies when it joined the con­spiracy in order 
to prove OCF is responsible for those prior acts.  On appeal, plain­tiffs contend OCF joined the alleged conspira­cy "at least by 1953."  If plaintiffs so allege on remand, they must provide evidence that OCF knew and approved of the acts of the other asbestos companies during the 1930s and 1940s in order for OCF to be liable.  

We also note that if the trial court, on remand, (1) finds sufficient evidence that OCF joined the conspiracy, but (2) does not find sufficient evidence that OCF is responsible for the acts of its coconspirators prior to OCF's entry into the conspira­cy, then evidence of those prior acts is still admissible for the limited purpose of showing the scope and nature of the conspiracy OCF joined.  Under these circumstances, however, the court must instruct the jury that it may consider the "prior acts" evidence only to show the scope and nature of the conspira­cy and not as showing that OCF is responsi­ble for those prior acts.  

Consistent with these views, we also hold that the trial court erred by giving plaintiffs' ten­dered in­struc­tion, which read, in rele­vant part:  "[Instruction No. 31A:]  ***  Each con­spir­a­tor is lia­ble for all of the acts of each con­spira­tor done in fur­ther­ance of the ob­jects of the con­spir­acy com­mit­ted before, or after, its entry into the conspir­acy."  Absent plaintiffs' proving that OCF knew and approved of its coconspirators' prior acts, this in­struc­tion did not accu­rate­ly state the law.  

B. Judicial Notice

The material in this section is not to be published pursuant to Supreme Court Rule 23.  Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23, eff. July 1, 1994.

Nonpublishable material under Supreme Court Rule 23 omitted.

C. The Trial Court's Refusal To Allow Exhibits 

To Go to the Jury 

OCF next argues the trial court erred when it "changed its mind about the admissibility" of three medical reports just prior to closing arguments.  In response, plain­tiffs argue that the court never reversed its ruling regard­ing the admissi­bility of the reports, but exercised its discretion by refusing to allow the exhibits to go to the jury during deliberations.  We agree with plain­tiffs.

Section 2-1107 of the Code of Civil Procedure (Code) provides that documents read or received into evidence "
may
 be taken by the jury to the jury room for use during the jury's delibera­tion."  (Emphasis added.)  735 ILCS 5/2-1107(d) (West 1994).  The decision whether to send exhibits to the jury room is within the trial court's sound discretion, and a reviewing court will not disturb that decision absent an abuse of discretion that preju­dices a party.  
People v. Hudson
, 157 Ill. 2d 401, 439, 626 N.E.2d 161, 177 (1993).  

Here, the trial court admitted into evidence three of OCF's exhibits:  (1) a 1937 United States Public Health Service report; (2) a 1938 United States Public Health Service report; and (3) a 1955 article by a Saranac researcher.  During the final jury in­struc­tion conference, the court declined "to submit those three documents to the jury."  The record clearly shows the court did not--as OCF contends--belatedly reverse its decision to admit the exhibits.  Instead, the court simply exercised its discretion by refusing to send the documents to the jury room.   

Thus, on remand, the trial court may, in its sound  discretion, decline to submit these exhibits to the jury.  Howev­er, the court should make clear to the parties that resolving what exhibits will go to the jury during delibera­tions is 
not
 the same as resolving what exhibits will be admitted into evi­dence.  Just because the court has admitted an exhibit does not necessarily mean  that it will go to the jury.  The court should make clear that it will decide that issue after the court has ruled on the admissibil­ity of the exhibits in question and prior to closing argu­ments (unless the court, in its discre­tion, makes that determina­tion earlier in the proceed­ings).

D. Form of OCF's Special Interrogatories

Nonpublishable material under Supreme Court Rule 23 omitted.

E.  
Nonpattern Instruction on Damages

OCF next argues that the trial court erred by giving plaintiffs' tendered nonpattern instruction advising the jury that all damages awarded to the Van Winkles would have to be awarded to them in this action or not at all.  We agree.

Plaintiffs Donald and Linda Van Winkle tendered the follow­ing instruction, asserting it was supported by the supreme court's holding in 
Varelis v. Northwestern Memorial Hospital
, 167 Ill. 2d 449, 657 N.E.2d 997 (1995):

"[Instruction No. 43:]  If you find for the plain­tiffs, Don and Linda Van Winkle, on the ques­tion of liabili­ty, the damages which you award in this case are all of the damages which they or Don Van Winkle's survivors will be permit­ted to re­cover for the injuries which he has sus­tained.  Even if the plain­tiff, Don Van Win­kle, dies from the injuries, the law pre­cludes his survivors from recover­ing any further damages."

In 
Varelis
 (167 Ill. 2d at 460, 657 N.E.2d at 1002), the supreme court held that, under the Wrongful Death Act (Ill. Rev. Stat. 1987, ch. 70, pars. 1 through 2.2), an action for personal injuries brought during a decedent's lifetime will preclude a subsequent action for wrongful death premised on the same con­duct.  Although the statements tendered as instructions may be literally true, nowhere in 
Varelis
 does the above language appear.  Further, Supreme Court Rule 239(a) provides that pattern jury instruc­tions should be used whenever they accurate­ly state the law applica­ble in a case.  134 Ill. 2d R. 239(a).  A trial court may give nonpattern jury in­struc­tions 
only
 when the pattern jury instruc­tion on point does not ade­quately state the law.  
Swartz v. Sears, Roebuck & Co.
, 264 Ill. App. 3d 254, 266, 636 N.E.2d 642, 650 (1993).

The pattern instructions actually given accurately stated the law governing damages awardable to Van Winkle if the jury found OCF liable for his injuries.  We conclude that plaintiffs' nonpattern instruction No. 43 was unnecessary and 
could
 
be
 viewed as advising the jury to compensate Van Winkle for 
both
 his lifetime damages and his wrongful death in the present action (though this action did not seek compensa­tion for Van Winkle's wrongful death).  Accord­ingly, we hold that the trial court erred by giving this nonpattern instruc­tion.

F. The Trial Court's Decision to Strike Mark Hicks' 

Punitive Damages Request

The material in this section is not to be published pursuant to Supreme Court Rule 23.  

Nonpublishable material under Supreme Court Rule 23 omitted.

G. Judgment 
N.O.V
.

The material in this section is not to be published pursuant to Supreme Court Rule 23.  

Nonpublishable material under Supreme Court Rule 23.

V. CONCLUSION

For the reasons stated, we reverse and remand for a new trial consistent with the views expressed herein.

Reversed and remanded.

KNECHT, J., concurs.

McCULLOUGH, J., dissents.

JUSTICE McCULLOUGH, dissenting:

When a question comes from a deliberating jury, a trial judge is faced with a dilemma.  Almost any response not agreed to by the litigants becomes fodder for an appeal.  Any selective reading or highlighting of certain instructions violates a com­mand contained in the instructions--do not single out an instruc­tion.

Counsel may make tactical decisions in recommending the choice of language of an instruction or which parts of a pattern instruc­tion should be given.  They do so for the best interests of their client.  The cooperation that occurs is not altruistic, but it is nonetheless cooperation.  The goal is to come up with a legally correct set of instructions to inform and guide the jury.  Courts of review frequently admonish appellants they cannot com­plain about an instruction unless an alternative instruction was offered.  
Holder v. Caselton
, 275 Ill. App. 3d 950, 959, 657 N.E.2d 680, 688 (1995); 
Kochan v. Owens-Corning Fiberglass Corp.
, 242 Ill. App. 3d 781, 800, 610 N.E.2d 683, 695 (1993).

When coun­sel and the trial judge confer on how to an­swer a jury question, they are conducting a mini instruction con­fer­ence.  In this case, OCF said both questions would be 
easy
 to answer yes.  Plaintiffs' counsel objected to this suggestion and suggested the court re­spond that the instruc­tions provided con­tain the applica­ble law.  Neither suggestion was of much as­sis­tance to the trial judge.

If the answer was so easy and obvious, OCF could have proposed an instruction--
i.e.
, a suggested response--in writ­ing.  Neither at trial nor at oral argument on appeal did OCF's counsel suggest precisely what the response should have been.  

OCF complains on appeal about the court's response to the jury questions.  OCF provided no meaningful assistance to the trial court in framing an appropriate response, nor did the plaintiffs.  However, it is OCF that contends it was disadvan­taged when the trial court replied with an accurate, often-used and standard response.  

Our supreme court has stated:

"[A] trial court may exercise its discretion and properly decline to answer a jury's in­quiries 'where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would poten­tially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another.'  
Childs
, 159 Ill. 2d at 228[, 636 N.E.2d at 539]."  
People v. McDon­ald
, 168 Ill. 2d 420, 460, 660 N.E.2d 832, 849-50 (1995).

The instructions previously given by the trial court correctly instructed the jury.  The answer, given by the trial court, after conference with counsel, was not error.

With respect to the remand issues, I do not believe reversible error occurred and would affirm the judgment of the trial court.