2020 IL App (1st) 172214-U

FIFTH DIVISION
September 30, 2020

No. 1-17-2214

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 07 CR 17339 |
| v. | ) ) | |
| DWIGHT THOMAS, | ) ) | Honorable Thomas Joseph Hennelly, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held:*  We affirm defendant's convictions for murder and attempt murder over his numerous contentions of error. The evidence presented at trial was not closely balanced, there was no error in questioning or instructing the jury, and defendant's sentence was not excessive.

¶ 2                                    BACKGROUND

¶ 3     After a jury trial, defendant Dwight Thomas was convicted of the first degree murder of

Frank Lucas, the attempted first degree murder of Gloria Patterson, and the aggravated battery of

Patterson with a firearm. His co-defendant, Kenyatta Brown, was tried and convicted separately.[1]

On appeal, defendant raises numerous contentions of error. We affirm.

¶ 4                                            FACTS

¶ 5      During the *voir dire*, the circuit court read the indictment to the jury. It specifically stated that defendant was charged with the murder of Frank Lucas and the attempted murder of Gloria Patterson. The court also questioned the potential jurors about the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472 (1984); Ill. S. Ct. R. 431(b) (eff. May 1, 2007). The court questioned the first panel as follows:

> "Do you understand and accept the following principles; that a person accused of a crime is presumed to be innocent of the charge against him?

> That presumption of innocence stays with the defendant throughout the trial and is not overcome unless from all the evidence you believe the State has proven his guilty [*sic*] beyond a reasonable doubt.

> Do you understand that this means the State has the burden of proving the defendant is guilty beyond a reasonable doubt? The defendant does not have to prove his innocence. The defendant does not have to present any evidence on his own behalf. Do any of you have any disagreement with any of these principles of law that I have just read?

> Record reflect no one raised their hand."

¶ 6      A venire member then interjected that a family member of his had been murdered. The court assured the panel that individual questions would be addressed in due course, and continued with the *Zehr* principles:

---

[1] Brown is not a party to this appeal. This court affirmed his conviction. *People v. Brown*, 2013 IL App (1st) 112692-U.

"Ladies and gentlemen do you understand that this means the defendant does not have to testify if he does not wish to? Do you understand that? Do you understand that if the defendant does not testify that this must not be considered by you in any way at arriving at your verdict? Do you also understand that if the defendant does testify you should judge his testimony the way you would judge the testimony of any other witness? Do you understand that you may not give more credence to the testimony of a police officer simply because he or she is a police officer, and you should judge his or her testimony of any other witness?

\* \* \*

Does anybody have any problems with any of the concepts or precepts that I have just read?".

The court used substantially similar language when questioning two further panels of potential jurors, including the question, "Do you understand that if the defendant does not testify that this must not be considered by you in any way in arriving at your verdict?". Defense counsel made no objection to the court's admonishments and a jury was impaneled.

¶ 7     At trial, Gloria Patterson testified that she had known defendant for several years before the night of the crimes, although she only knew him by his nickname, Westside. She had also known co-defendant Kenyatta Brown since elementary school. The other victim, Frank Lucas, was the father of Patterson's two sons.

¶ 8     Patterson testified that defendant and Lucas got into fistfight at a party a few days before the crimes. At one point, defendant handed a chain, some money, and some cocaine to Darius Harris for safekeeping. The battle resumed and Lucas "got the better of the fight". Defendant then returned to Harris to collect his possessions, but Harris apparently kept the cocaine.

3

Defendant then demanded that Lucas reimburse him for the lost cocaine. Both Lucas and Patterson refused. On cross-examination, Patterson admitted that in her grand jury testimony, she had stated that Harris had kept defendant's money rather than the cocaine.

¶ 9    Patterson testified that on the evening of February 3, she and Lucas threw a birthday party for one of their two sons at an amusement park in Tinley Park. Sometime after the group left the amusement park, Patterson noticed that one of her sons was missing. She called the amusement park and learned her son had been left there. Defendant and Lucas then drove to the Tinley Park police station to pick up the child.

¶ 10    Defendant and Lucas drove to a liquor store around 1 a.m., February 4. With their son sleeping in the back of the car, Lucas in the driver's seat, and Patterson in the front passenger seat, they drove to a friend's house. As they pulled up to the house, Lucas called the friend to tell her that they had arrived. As they stopped in front of the house, Patterson saw two men in hooded shirts walk out of a gangway on the side of the street nearest her. As they approached, Patterson recognized them as Brown and defendant. Although they had their hoods up, their faces were not obscured. Over his hooded sweatshirt, defendant was wearing a brown jacket with metal studs, which Patterson identified at trial. The area was lit by a streetlight, which allowed Patterson to not only identify Brown and defendant, but also to see that Brown's gun was a silver "automatic" and defendant's was a black revolver. She testified that she later identified the types of guns used by comparing the sidearms carried by police detectives who interviewed her.

¶ 11    Patterson testified that Brown and defendant walked to within eight or ten feet of the car and both opened fire. The shooting only lasted for a couple of seconds. Patterson testified her car window was shot out and that she was shot in her lower lip, causing her to bleed from her mouth. Lucas was evidently shot as well. He tried to drive away but was unable to do so. Unable to open

the driver's side door because the car was double parked, Lucas climbed out of the window. Patterson saw Brown and defendant flee down the gangway. The police arrived very shortly thereafter, and Patterson immediately told them that she and Lucas had been shot by Brown and Westside. She called a friend named Katahnna Washington very shortly thereafter and told her that she had been shot by Brown and defendant. She did not recall ever expressing any doubt to Washington about whether defendant was the second shooter; she remembered telling Washington that she saw defendant's face and recognized him by his build and jacket.

¶ 12     The following morning, Patterson identified defendant in a photograph shown to her by a police detective. Two months later, she identified defendant in a live lineup. Patterson testified that at some point, defendant called Washington while she was with Patterson, hoping to persuade Patterson not to testify against him. He offered her drugs or money "not to come to court." She denied ever asking for any money related to this case.

¶ 13     Patterson also testified that she and defendant had occasionally sold drugs together. Also involved in the drug business were Lucas, Brown, Timothy Christmas, and Nicholas Griffin. She testified that defendant and Christmas had a similar build but estimated that defendant was a bit taller. Patterson denied ever talking to Charles Green about this case.

¶ 14     Officer Victor Creed of the Chicago Police Department testified that he and his partner arrived at the scene of the shooting approximately two minutes after receiving a dispatch about a shooting. As he approached the car, he observed that the front passenger and driver's side windows were shattered. Patterson was bleeding profusely from her facial wound and Lucas was unconscious, with an apparent gunshot wound to the shoulder. Patterson told Creed that Brown and Westside were the shooters, and that they had fled down the gangway. Patterson gave a

description of Brown, but emergency medical technicians started to treat her before she had a chance to describe the second shooter.

¶ 15   Officer Robert Spiegel testified that he also responded to the scene of the shooting. When he arrived, he followed footprints through the snow into the gangway. While in the gangway, he found a cellular telephone in the snow. It appeared to Spiegel that the phone had been dropped by somebody who was moving "because the phone kind of slipped in the snow."

¶ 16   Detective Patrick Ford testified that he had interviewed Patterson in the hospital shortly after the shooting. He showed her a photograph of Brown and she confirmed that he was one of her assailants. She described the other shooter, Westside, as "a male black, five-six to five-eight, twenty-four to twenty-six years old with a light complexion, or medium complexion". She also reported that he had been wearing a brown leather jacket and that he frequently stayed with his girlfriend Tenita Tucker. In his written notes, Ford wrote that Patterson had told him that Brown shot her in the face. Patterson told Ford that both Brown and defendant had fired shots, but she only specifically mentioned seeing muzzle flashes from Brown's gun.

¶ 17   Detective Luke Connolly testified that he prepared a photograph array including a photograph of defendant. He visited Patterson with the array, and she identified defendant as the second shooter.

¶ 18   A ballistics expert testified that he examined evidence recovered from the crime scene, including an unfired round of ammunition, a bullet recovered from Lucas's body, metal fragments and spent cartridges. He opined that the bullet recovered from Lucas's body was the same caliber as the recovered cartridges. He also opined that there were either one or two guns used in the shooting. He testified that the second possible gun could have been a revolver of the same caliber as the gun that fired the cartridges that he examined.

¶ 19    Detective Dan Stover testified that Katahnna Washington contacted him and gave him three phone numbers that might be associated with the case. He requested the records associated with those numbers from Sprint Nextel. Stover also interviewed Washington at the police station. In her presence, he dialed one of the phone numbers that she had given to him, a number ending in 3380.[2] The cell phone recovered from the scene of the shooting began to ring. Washington then pushed a button on her cell phone, the recovered cell phone "chirped", and her nickname "Tawn" appeared on the screen.

¶ 20    Stover then testified that after defendant was arrested in Indiana, he and his partner went to Indiana to extradite him to Illinois. When Stover took defendant into custody, he also collected the belongings with which defendant had been arrested, including defendant's brown leather Pelle Pelle brand jacket with silver studs.

¶ 21    Stover testified that he interviewed Gloria Patterson. She told him that Brown had used a semiautomatic handgun and defendant had used a revolver. Stover then showed her his service revolver and his partner showed her his semiautomatic sidearm, and Patterson confirmed that defendant had used a revolver. On cross-examination, Stover admitted that this colloquy was not recorded in his written investigation notes.

¶ 22    The custodian of records for Sprint Nextel testified that the recovered cell phone was prepaid, and therefore were available for purchase without photo identification or an address. The phone also had a "chirp" or direct-connect feature, that allowed phones to communicate without creating a record of the call. Consequently, the phone records did not list the names of the users. The call log for the recovered 3380 telephone revealed incoming calls from a number

---

[2] The record includes numerous references to several telephone numbers. We will refer to the relevant phone numbers by their last four digits.

ending in 9631 at 1:44 a.m. and 1:45 a.m., and several more incoming calls from that number between 3:08 a.m. and 3:19 a.m. All the calls went straight to voice mail.

¶ 23    Nicholas Griffin, then serving ten-year concurrent sentences for controlled substance convictions, testified next. Griffin testified that he was a long-time friend and former classmate of Kenyatta Brown. He testified that he had known defendant almost as long. He testified that he had a cellular telephone with which he regularly communicated with defendant and Brown. Griffin had two phone numbers programed into his phone for Brown, one of which ended in 3380. The assistant state's attorney handed Griffin the cell phone that had been recovered from the scene of the shooting. Scrolling through the contacts list on the phone, Griffin identified his own number labeled with the name "Kid", a nickname which Brown, and only Brown, called him. He also identified the name "Tawn" in the phone as Katahnna Washington. Finally, Griffin identified defendant's phone number ending in 9631. Griffin testified that in the early morning hours of February 4, he received two calls from Brown on defendant's 9631 line.

¶ 24    On cross-examination, Griffin testified that Nextel phones with a direct-connect or "chirp" function are popular with drug dealers because the phones are inexpensive and hard to track. He also admitted that he had not talked to defendant when Brown called him on defendant's phone. Finally, Griffin testified that he had written letters asking for leniency in his own pending criminal cases in consideration of his cooperation in this case. He testified that he had faced 35 years' imprisonment but hoped to receive probation. After an assistant state's attorney wrote a letter on his behalf, he accepted a plea agreement for a 10-year sentence, of which he served two years before being released on parole. At the time of trial, Griffin was in custody for a parole violation.

¶ 25    Chicago Police Officer Emmitt McClendon testified that he had arrested defendant in Lake County, Indiana. While being arrested, defendant asked to put on his jacket and directed McClendon to the brown leather jacket later identified by Patterson at trial. The State rested. Defendant moved for a directed verdict, but the court denied the motion.

¶ 26    The first witness for the defense was a long-time friend of defendant, Charles Green. Green testified that a few months after the shooting, he had a conversation with Gloria Patterson near the scene of the crime. He claimed that Patterson had told him that she did not see the shooters because she was ducking down or asleep at the time of the shooting. He also testified that she had asked him for $500 and said, "if you pay me, I will do this or I will do that." On cross-examination, Green admitted that he had previously told investigators that he did not recall the time or place of the alleged conversation with Patterson, and that his excessive drinking and drug use affected his memory. Green testified that he made these statements because he simply did not want to be involved in the case.

¶ 27    Darrius Harris testified next. He, too, was a longtime friend of defendant. He testified that he was present at the fight between defendant and Lucas a few days before the shooting. He testified that everyone was "drinking and playing cards." He testified that Lucas and defendant got into a fight. He denied that defendant ever handed him any drugs, money, or other possessions. He characterized the fight as "petty" and testified that defendant bested Lucas in the fight.

¶ 28    Katahnna Washington testified that right after the shooting, Patterson called her on the phone. Patterson was mumbling because she had just been shot in the mouth, but she told Katahnna that Brown and Westside had just shot her and Lucas. Shortly after Patterson got out of the hospital, she and Washington discussed the shooting. Washington testified that Patterson

described how she clearly saw Brown's face and flashes from the muzzle of his gun, but that she did not see the second shooter's face. Rather, she said that she recognized defendant by his body type and his black coat with metal studs. Washington testified that Patterson had no doubts about her identification of defendant as the second shooter. In the ten or so times that Washington had discussed the shooting with Patterson, Patterson never attributed the shooting to anyone other than Brown and defendant.

¶ 29    The next witness was Jessica Daniels, who testified that she was in a romantic relationship with defendant at the time of the crimes. On February 3, Daniels got sick and went to the hospital. There, she learned that she was pregnant with defendant's child. Daniels spent the entire evening trying to reach defendant by telephone. Around midnight, defendant finally answered his phone and Daniels arranged to pick him up from Tenita Tucker's home in Alsip. She testified that she picked up defendant around 12:30 a.m. and the two of them went to her house, where they spent the next few hours talking. Daniels testified that defendant did not make any phone calls during this period, although he did have his cell phone with him. The two of them went to bed at around 3 or 4 a.m., and defendant was still in her bed when she awoke at 10 a.m. Daniels admitted that, although she knew that defendant was a suspect in this case, she never told the police that he was with her at the time of the shooting.

¶ 30    In rebuttal, the State called William Pavlik, an investigator with the Cook County State's Attorney's office. Pavlik testified that he had interviewed Charles Green about his alleged conversation with Gloria Patterson. Pavlik testified that Green could not recall when or where that conversation took place or who was present. Green said he did not remember any of the details of what Patterson said because "he was taking a lot of pills and drinking a lot of whiskey"

at the time. Green never told Pavlik that Patterson said she was asleep or ducking down at the time of the shooting, or that Patterson wanted money in consideration for not appearing in court.

¶ 31   When recalled as a rebuttal witness, Detective Stover described his custodial interrogation of defendant. During that interrogation, defendant admitted to going by the nickname Westside. Defendant told Stover that he lived with Tenita Tucker at "22nd and Avers in Chicago," although he could not give a specific street address. Defendant said that the evening before the shooting, he and Tucker had a birthday party for their son. He told Stover that he and Tucker returned home from the party at around 12:30 a.m., joined by his brother and his brother's girlfriend. Defendant told Stover that they continued drinking for some time and then went to bed. Defendant never mentioned leaving the house or spending the night with Jessica Daniels.

¶ 32   Stover further testified that, during the interview, defendant told him that he had a cell phone with a number ending in 9631. Defendant told Stover that he received several phone calls in the early morning hours of February 4. When asked about calls made to Kenyatta Brown from that line in the early morning hours of February 4, defendant told Stover that "he didn't know how that could be." On cross-examination, Stover admitted his contemporary notes listed two phone numbers for defendant but did not indicate which number had received calls on February 4. Stover explained, however, that regardless of what the notes said, he distinctly remembered that he and defendant were discussing the 9631 number. On re-direct examination, Stover testified that he prepared a typewritten report shortly after the interrogation, and that report included defendant's admission that he had received the early-morning phone calls on the 9631 number. The typewritten report also indicated that Stover had confronted defendant with the fact

that there had been several calls from the 9631 number to Kenyatta Brown's phone shortly after the time of the shooting.

¶ 33    The State's final rebuttal witness was Tenita Tucker. Tucker testified that she lived with defendant in Alsip with her children. She testified that she had never lived at 22nd Street and Avers Avenue with defendant. On February 3, defendant and Tucker had a birthday party for their son. After the party, they gave a ride to some friends and then visited the house where defendant's brother and Tucker's sister lived. Tucker and defendant drove home to Alsip around 11:00 p.m. Defendant's brother and his girlfriend did not come over that evening. Tucker and defendant went to bed with the children around midnight. During the night, Tucker was woken up by a fussing child. She found that defendant was no longer in the bed. She observed that the car was still there, but defendant had evidently left the house. She called defendant's cell phone but got no answer. Later, Tucker received a return call from defendant, but did not answer. She did not see him again for several days.

¶ 34    The circuit court instructed the jury in accordance with the Illinois Pattern Instructions (IPI), Criminal. Regarding the charge of the attempted murder of Gloria Patterson, the court instructed the jury, in relevant part:

> "To sustain the charge of attempt first degree murder, the State must prove the following propositions. First, that the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the killing of an individual, and second, that the defendant, or one for whose conduct he is legally responsible, did so with the intent to kill an individual." See Illinois Pattern Instruction, Criminal, No. 6.07x (4th ed. 2000) (Issues In Attempt First Degree Murder).

12

¶ 35 Regarding the charge of aggravated battery with a firearm, the court gave the following instruction:

> "If you find the defendant is not guilty of the offense of attempt first degree murder you should not consider the State's additional allegation regarding the offense attempt first degree murder.
>
> If you find the defendant is guilty of attempt first degree murder, you should then go on with your deliberation to decide whether the State has proved beyond a reasonable doubt the allegation that during the commission of the offense of attempt first degree murder the defendant was armed with a firearm."

¶ 36 During deliberations, the jury sent out a note with a question about how to structure its verdicts. The note read:

> "Order of operations?
>
> In what order must we render a verdict?
>
> A or B.
>
> A) 1st degree murder then attempt 1st degree murder.
>
> B) attempt 1st degree murder 1st degree murder."

After consulting with the parties, the court responded that the jury was to "refer to the instructions [it had] been given and continue to deliberate."

¶ 37 The jury returned guilty verdicts on the charges of first degree murder, attempt first degree murder, and aggravated battery with a firearm. However, the jury also found that the State had not proved beyond a reasonable doubt that defendant had personally used a firearm in the commission of those crimes.

¶ 38    Before sentencing, defendant sought to raise a *pro se* claim of ineffective assistance of counsel. The court incorrectly informed defendant that he could not do so while still represented by trial counsel. Defendant withdrew his *pro se* claim and moved for a new trial or an acquittal notwithstanding the verdict. The court denied the motion. The circuit court sentenced defendant to consecutive terms of 54 years' imprisonment for the first degree murder of Frank Lucas and 27 years' imprisonment for the attempted first degree murder of Gloria Patterson, and a 14-year concurrent sentence for aggravated battery with a firearm.

¶ 39    Defendant appealed on several grounds. This court held that the circuit court had erred by telling defendant that he could not file a *pro se* claim of ineffective assistance of trial counsel unless his appointed counsel withdrew. *People v. Thomas*, 2011 IL App (1st) 100709-U, ¶ 15. As a result, this court did not reach any of the other issues raised. *Id.* We remanded the case for the limited purpose of allowing defendant to file a posttrial motion alleging the ineffective assistance of counsel and for a *Krankel* hearing, noting that defendant could re-raise his other contentions of error if his motion was unsuccessful. *Id.*

¶ 40    On remand, the defendant filed a *pro se* motion for a new trial, alleging ineffective assistance of counsel. Defendant then hired private counsel, who filed an amended motion, alleging that trial counsel rendered ineffective assistance in the following ways: (1) by failing to impeach Patterson with evidence of her pending drug charges, (2) by failing to object to the circuit court's Rule 431(b) admonishments, (3) by failing to object to the term "an individual" rather than "Gloria Patterson" in the jury instruction for attempted murder, and (4) by failing to investigate whether Nicholas Griffin received a better plea deal because of his cooperation in this case.

¶ 41     The circuit court held a hearing on the motion for a new trial, at which defendant and Patterson both testified. The court denied the motion. The parties do not raise any issues regarding the post-remand proceedings, so we do not discuss them further. This appeal follows.

¶ 42                                   II. ANALYSIS

¶ 43     In this second direct appeal, defendant re-raises the issues that this court did not address in his first appeal. He argues that (1) the court failed to properly follow Rule 431(b), (2) trial counsel rendered ineffective assistance in several ways, and (3) the jury was improperly instructed because the attempt murder instruction did not mention the victim by name. He also raises two new arguments that did not appear in his first appeal: (1) that the court did not properly respond to the jury's question; and (2) that his sentence is excessive. We will address these issues in turn but begin with an analysis of the strength of the evidence, since resolution of many of the issues turn on whether the evidence was closely balanced.

¶ 44                           A. Strength of the Evidence

¶ 45     The bulk of defendant's arguments rely on either plain-error review or claims that his counsel rendered ineffective assistance by failing to introduce or object to specific evidence. The plain error doctrine allows a reviewing court to bypass normal forfeiture principles and consider an otherwise unpreserved error affecting substantial rights when either: "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005); see also Ill. S. Ct. R. 615(a). Ineffective assistance of counsel claims require the defendant to prove (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that there exists a reasonable probability that, absent the errors, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 46    Because of the nature of defendant's claims, a central question of this appeal is whether the evidence at trial was so closely balanced that the claimed errors completely undermine his convictions. See *People v. White*, 2011 IL 109689, ¶ 133 ("Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him"). For the sake of economy, we address the closeness of the evidence before addressing each specific claim of error.

¶ 47    The principal evidence was the eyewitness testimony of Gloria Patterson. Courts consider the following factors in evaluating the ability of a witness to make a reliable identification: (1) the opportunity of the witness to view defendant at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the level of accuracy of the witness's prior description of defendant; (4) the level of certainty demonstrated by the witness at the time of his confrontation with defendant; and (5) the length of time between the crime and the confrontation. *People v. Manion*, 67 Ill. 2d 564, 571 (1977) (adopting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). Although defendant does not argue the admissibility of Patterson's identification of defendant, *Biggers* provides a helpful rubric to analyze the reliability of her testimony.

¶ 48    Applying each of the *Biggers* factors, we find that Patterson's identification of defendant was extremely reliable. Patterson had an adequate opportunity to view defendant at the scene of the shooting. Although she testified that the shooting only took a couple of seconds, she testified that she observed defendant and Brown coming out of the gangway and approaching the car before they began shooting. She also testified that she was near defendant—8 to 10 feet—and that his face was lit by the street lamps and was not obstructed by his hood. See *People v.*

*Williams*, 143 Ill. App. 3d 658, 662 (1st Dist. 1986) ("a positive identification need not be based upon perfect conditions for observation, nor does the observation have to be of a prolonged nature"). The level of detail in Patterson's description shows the close attention she paid. She identified both defendant and Brown, as well as the color and type of each gun, and what each shooter was wearing, including defendant's brown leather jacket with studs. This testimony shows a level of attention and detail adequate to satisfy the second and third *Biggers* factors. Finally, the immediacy with which she recognized defendant makes the identification especially reliable. She had known defendant for several years at the time of the shooting; within three minutes of the shooting, she told the police that defendant was the second shooter; she then told Katahnna Washington that defendant was one of the shooters; a few hours later, she identified defendant in a photo array; two months later she identified defendant in a live lineup. Illinois courts have found identifications to be reliable where significantly more time has elapsed between the crime and the identification. See, *e.g.*, *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (upholding an identification made two years after the crime). Moreover, the physical evidence corroborated her account of the shooting. Brown's cell phone was found in the gangway down which Patterson said that he and defendant fled. Defendant was arrested in possession of the brown leather jacket which Patterson identified in court as the jacket of her assailant.

¶ 49 Defendant argues that Patterson's testimony was seriously impeached by the witnesses for the defense. We disagree. Green's testimony that Patterson had told him that she was asleep at the time of the shooting was hardly credible; Patterson denied ever talking to Green about the case, and Green's own account of his interactions with Patterson varied wildly from his being certain to his having consumed too much alcohol and drugs to remember. Harris's testimony

confirmed Patterson's testimony that defendant and Lucas had been in a fight a few days before the shooting, only differing with her account in minor details. Washington's testimony also did not seriously impeach Patterson's account. In the first place, Washington confirmed that Patterson, while still unable to speak clearly because of her mouth wound, told her that defendant was the second shooter. She also testified that Patterson had never said the shooters were anybody other than Brown and defendant. Moreover, Washington corroborated Patterson's testimony that defendant called her during the pendency of this case and allegedly attempted to bribe her into not testifying.

¶ 50    Defendant contends that the evidence must be closely balanced because no physical evidence ties him to the scene of the crime. However, the evidence in a trial is not closely balanced merely because it was primarily circumstantial rather than direct. *People v. Belknap*, 2014 IL 117094, ¶ 56. ("While there were no eyewitnesses to the crime, other evidence pointed to defendant as the perpetrator and excluded any reasonable possibility that anyone else inflicted [the victim's] injuries."). Aside from Patterson's testimony, Brown's dropped cell phone ties defendant to the crime scene. The evidence showed that several short phone calls were made from defendant's phone to Brown's phone shortly after the shooting, as well as two calls from Brown to Griffin on that same line. This evidence bolstered the States theory that defendant was with Brown at the scene of the crime and shortly afterward, when Brown realized that he had lost his phone. Defendant was also arrested in possession of the jacket that Patterson identified as the jacket worn by the second shooter.

¶ 51    Defendant also argues that the evidence must be closely balanced because he presented an alternative account of his whereabouts at the time of the shooting. See *People v. Sebby*, 2017 IL 119445, ¶ 63 (finding that the evidence in the case was closely balanced because each side

presented a credible version of the events). As discussed, Patterson's version was reliable and was supported by extrinsic evidence, such as defendant's jacket and Brown's cell phone. Defendant's alibi evidence, on the other hand, was uncorroborated and was contradicted by his own false exculpatory statements made to the police. The account he had given to the police at the time of his arrest was totally inconsistent with the testimony of either Tucker or Daniels. Tucker testified she had never lived where defendant told the police he had spent that night. Defendant's account included spending the evening with two people whom Tucker testified did not come over. His version omitted what he allegedly did after midnight, when Tucker testified that she woke up and found that he was gone. It is true that Jessica Daniels testified that she was with defendant at the time of the shooting, but her account still does not accord with the account defendant gave to the police. Defendant argues that the jury could have concluded that he had lied to the police simply to avoid the embarrassment of Daniels's pregnancy while he was still romantically involved with Tucker. A much more reasonable inference is that defendant lied to the police because he was conscious of his guilt. See *People v. Milka*, 211 Ill. 2d 150, 181 (2004) ("A false exculpatory statement is probative of a defendant's consciousness of guilt." (Internal quotation marks omitted.)).

¶ 52     Our qualitative assessment is that the evidence here was not closely balanced. The evidence of defendant's guilt was so overwhelming that, as discussed below, none of the claimed errors could have tipped the scales of justice against defendant.

¶ 53                                B. Jury Selection

¶ 54     Defendant contends that he is entitled to a new trial because the circuit court failed to comply with Illinois Supreme Court Rule 431(b) when questioning the prospective jurors.

¶ 55 Supreme Court Rule 431(b) provides in relevant part that the trial court shall ask each potential juror whether that juror "understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her ***." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).[3] "The language of Rule 431(b) is clear and unambiguous." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The rule "mandates a specific question and response process." *Id.* We apply a *de novo* standard of review when considering compliance with supreme court rules. *Id.* at 606-07.

¶ 56 Although defendant's trial counsel did not make a timely objection to the court's statements, the circuit court's failure to properly follow Rule 431(b) is reviewable under the first prong of plain-error analysis. *Sebby*, 2017 IL 119445, ¶ 52. Under that analysis, we may bypass normal forfeiture principles and consider an otherwise unpreserved error affecting substantial rights "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." *Herron*, 215 Ill. 2d at 178.

¶ 57 Whether the circuit court failed to comply with the letter of Rule 431(b) presents a close question. Defendant argues that the court erred by asking whether the venire had any problems or disagreements with the *Zehr* principles rather than asking whether they understood and accepted the principles. See *Sebby*, 2017 IL 119445, ¶ 49 (trial court erred in asking jurors whether they "had any problems" or "believed in" the principles). Moreover, he points out that, when questioning the second and third panels of potential jurors, the court merely asked whether they

---

[3] Since defendant's trial, the language of Rule 431 has been amended slightly. Compare Ill. S. Ct. R. 431(b) (eff. July 1, 2012) with Ill. S. Ct. R. 431(b) (eff. May 1, 2007). This amendment has no bearing our analysis.

understood the fourth principle, not whether they accepted it. However, as the State points out, the court prefaced its discussion of the *Zehr* principles by saying, "Do you understand and accept the following principles". After the recital of the principles, the court asked, "Does anyone have any problems with any of the concepts or precepts that I just read?" Because the court used the preferred "understand and accept" language at the beginning of the recital, we find that the later use of the more colloquial "does anyone have any problems" language did not amount to error. The court substantially complied with the "specific question and response process" mandated by the rule. See *Thompson*, 238 Ill. 2d at 607.

¶ 58    Even if the court had committed error in this respect, the first prong of the plain error rule would still not be met. As discussed above, the evidence in this case was not closely balanced. Given the overwhelming evidence of defendant's guilt, we cannot say that any error in by the court in following Rule 431(b) was dispositive. See *Herron*, 215 Ill. 2d at 178.

¶ 59                          C. Cross-Examination of Witnesses

¶ 60    Defendant's next contention is that trial counsel provided ineffective assistance by failing to adequately impeach Gloria Patterson and Nicholas Griffin. Claims of ineffective assistance of counsel are governed by the test set forth in *Strickland* and adopted in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). To succeed on such a claim, a defendant must prove (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that there exists a reasonable probability that, absent the errors, the outcome would have been different. *Strickland*, 466 U.S. at 687. To satisfy the first prong of the *Strickland* test, a defendant must overcome the "strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). As discussed above, the second prong is similar to the "closely balanced evidence"

21

analysis of plain error. *White*, 2011 IL 109689, ¶ 133. Decisions on cross-examination and impeachment of witnesses usually may not serve as the basis of a claim for ineffective assistance of trial because they are matters of trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997).

¶ 61    Defendant argues that trial counsel failed to cross-examine Patterson regarding two pending drug charges against her, and thus a potential motive to testify for the State. The record shows that defense counsel did cross-examine Patterson as to her drug dealing, eliciting testimony that she, Lucas, defendant, Brown, and others occasionally sold drugs together. Hence, the jury was able take her criminal past into account when assessing her credibility. Moreover, there is no evidence in the record that the drug charges were pending against Patterson when she first identified defendant to the police as one of her assailants—mere minutes after the shooting—nor at the time of any of her later identifications of defendant to Katahnna Washington and police detectives. Consequently, it was not objectively unreasonable for trial counsel to forego that line of questioning. See *Pecoraro*, 175 Ill. 2d at 327 (holding that such strategic decisions amount to ineffective assistance only if they are "objectively unreasonable").

¶ 62    Defendant also argues that his trial counsel rendered ineffective assistance by failing to investigate and impeach Nicholas Griffin with respect to his plea agreement. Defendant argues that the transcripts from Griffin's plea hearing establish that he received a more lenient sentence because of his cooperation in this case. This information, he contends, could have impeached Griffin's testimony that he did not get a deal for cooperating in this case.

¶ 63    However, defense counsel's cross-examination of Griffin elicited the relevant facts needed to impeach him. Griffin testified that he wrote letters to the prosecutors in this case seeking assistance in his pending drug cases. Griffin also testified that a prosecutor did, in fact, write a letter on his behalf. Finally, his testimony showed that, although he was facing a potential

sentence of 35 years' imprisonment, he received a plea deal for 10 years' imprisonment, of which he only served 2 years. The jury was presented a clear picture of how Griffin sought leniency in exchange for cooperating in this case, received a letter from prosecutors on his behalf, and received a sentence significantly lower than he might have received otherwise. How defense counsel chose to elicit that impeachment evidence was an issue of trial strategy and cannot serve as a basis for a claim of ineffective assistance. See *Pecoraro*, 175 Ill. 2d at 326.

¶ 64    Trial counsel's decisions in cross-examining Patterson and Griffin were not objectively unreasonable, and therefore do not satisfy the first prong of the *Strickland* test. Moreover, as discussed above, the evidence in the trial was so overwhelming, that the alleged ineffective assistance could not have prejudiced defendant.

¶ 65                             D. Prior Consistent Statement

¶ 66    Defendant's next argument is that his trial counsel rendered ineffective assistance by failing to object to Detective Stover's testimony that his contemporary typewritten report was *consistent* with his trial testimony. As discussed above, claims of ineffective assistance are evaluated using the *Strickland* test. Challenging objectionable evidence is part of rendering effective assistance. See *People v. Moore*, 279 Ill. App. 3d 152, 157 (1996) (failure to object to patently inappropriate testimony cannot be construed as strategy rather than mistake).

¶ 67    "Generally, statements made prior to trial are inadmissible for the purpose of corroborating trial testimony or rehabilitating a witness." *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010) (citing *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005)). This is to prevent the factfinder from believing a statement simply because it has been made before. *Id.* However, "prior consistent statements" are admissible if there is a charge that the witness has recently

fabricated the testimony, or if the witness has a motive to testify falsely. *People v. Heard*, 187 Ill.2d 36, 70, (1999).

¶ 68    Defendant contends that trial counsel should have objected to the use of Stover's written report to rehabilitate him as a witness. Defense counsel had confronted Stover with the fact that his contemporary notes about the custodial interrogation included two telephone numbers but did not indicate which of the numbers defendant had supposedly been using on the day of the crime. Stover testified that, despite that omission in his notes, he clearly recalled discussing defendant's 9631 line. Defendant argues that the State's use of the contemporary typewritten report, which *did* indicate the phone number at issue, did not satisfy either of the possible exceptions in *Heard*. He contends that the cross-examination of Stover did not raise any implication of recent fabrication or motivation to lie.

¶ 69    Defendant compares this case to *McWhite*, in which a police officer was impeached with the omission of an important fact—the location of recovered narcotics—in his initial vice case report. *McWhite*, 399 Ill. App. 3d at 639. This court found the State's attempt to rehabilitate the witness with that prior consistent statements made during a preliminary hearing was improperly admitted. *Id.* at 642. Critically, defendant's trial counsel did not imply or assert that the officer had recently fabricated his testimony, "counsel was merely impeaching [the officer's] credibility with the omission from the vice case report." *Id.* The State argues that this case is distinguishable because defense counsel implied that Stover had recently fabricated the fact that defendant had admitted to using the 9631 number on the morning of the crimes.

¶ 70    Superficially, this case appears to parallel *McWhite*. But there is a vital distinction. In *McWhite*, the police officer was the sole witness and the trial court specifically mentioned its reliance on the prior consistent statement in making its ruling. *Id.* at 643. For that reason, this

court ruled that the error could not be harmless. *Id.* In this case, neither the prior consistent statement nor the impeachment that preceded it could have had any tipping point effect on the verdicts. See *id.* ("To determine whether an ordinary trial error, such as the improper admission of hearsay evidence, was harmless, we must ask whether the verdict would have been different if the evidence had not been admitted.") As discussed above, the evidence here was overwhelming. Moreover, the testimony of Griffin and Stover both tied defendant to the 9631 phone number, and consequently, the phone that Brown dropped at the scene of the crime. The impeachment of Stover with his own notes merely confirmed Stover's testimony that defendant had admitted that one of his phonelines was the 9631 number. Consequently, trial counsel's failure to object to the admission of Stover's prior consistent statement resulted in a harmless error at most. Where any resulting error was harmless, the failure of counsel cannot satisfy the second prong of *Strickland*.

¶ 71                              E. Jury Instruction

¶ 72    Defendant argues that the jury was improperly instructed because the instruction for the charge of attempt first degree murder only mentioned "an individual" rather than mentioning Gloria Patterson by name. Consequently, he contends that the jury could have thought that it could convict defendant of attempt murder of *any* individual, including Lucas.

¶ 73    "Although jury instructions are generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the applicable law was accurately conveyed." *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008) If an ordinary person would find the instructions misleading or confusing, the instructions are erroneous. *Herron*, 215 Ill. 2d at 187-88. "Supreme Court Rule 451(a) requires that in a criminal case, if the court determines the jury should be instructed on a subject, and the Illinois Pattern Jury Instruction (IPI), Criminal, contains an applicable instruction, then the IPI instruction 'shall' be

given unless the court determines it does not accurately state the law." *People v. Hopp*, 209 Ill. 2d 1, 7 (2004). Defendant did not object to the pattern instructions as given, but Rule 451(c) provides, "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). This rule is coextensive with the plain error rule. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

¶ 74   Defendant argues that IPI 6.07x should have been modified, with Patterson's name in place of "an individual." He relies primarily on *People v. Anderson*, 2012 IL App (1st) 103288. In *Anderson*, the defendant was charged with the murder of Darryl Hart and the attempt murder of Ozier Hazziez. *Id.*, ¶ 1. Hazziez was not shot, had no interaction with the defendant, and did not see defendant shoot at him. *Id.*, ¶¶ 5-6. The attempt murder IPI was given with the language "an individual" rather than mentioning Hazziez by name. *Id.*, ¶ 56. This court found that "under the narrow set of facts" in that case, the court erred in giving the attempt murder IPI instruction as written. *Id.*, ¶ 64.

¶ 75   The State argues that *Anderson* is easily distinguished. The attempt murder victim in *Anderson* did not see the defendant shoot at him, did not know what direction defendant was shooting, and was not shot. Gloria Patterson, on the other hand, saw defendant and Brown shoot at her. She looked Brown full in the face and observed the muzzle flare from his gun. Her car window was shot out and a bullet struck her in the face, causing "profuse" bleeding and a trip to the hospital. Given these facts, the State argues, the jury could not have mistakenly believed that anyone other than Patterson was the alleged victim referred to in the attempt murder instruction. Moreover, the circuit court read the indictment during the *voir dire*, so the jury was always aware that Patterson was the victim in the attempt murder charge. See *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 34 (rejecting the same IPI argument, in part because the trial court had read

26

the indictment during *voir dire*). We agree with the State; this case does not fall within the "narrow set of facts" of *Anderson* and there is no probability that the jurors were confused as to whether Patterson was the victim of the attempted murder.

¶ 76    Even if the instruction had been given in error, the same considerations lead to the conclusion that the evidence on this issue was not closely balanced. In *Anderson*, the court found that the evidence was closely balanced because the only evidence that the defendant had fired his gun *at* the attempt murder victim was the victim's testimony that he heard gunshots as he ran away and a vague—and later recanted—statement that the defendant had shot at "another person" besides the murder victim. *Anderson*, 2012 IL App (1st) 103288, ¶ 65. The evidence here shows indisputably that Brown fired his gun at—and actually shot—Patterson. The evidence was, therefore, not closely balanced as to whether Patterson was the victim of attempt first degree murder.

¶ 77                                    F. Jury Question

¶ 78    Defendant next argues that the circuit court erred in its response to the jury's question about the order in which it should render its verdicts. He contends that the circuit court should have given a substantive response to the question, or at least sought clarification of the jury's question.

¶ 79    The State first argues that this issue is forfeited. Defendant did not object at the time of the alleged error, did not raise the issue in his posttrial motion, and did not raise the issue in his first appeal. Although this case comes to us in an unusual procedural posture, an issue that could have been raised in an initial direct appeal, but was not, cannot be raised in a second direct appeal. See *People v. Johnson*, 352 Ill. App. 3d 442, 448 (2004) (noting that issues not raised in a first direct appeal were procedurally barred in the second direct appeal after remand); *People v.*

*Petrenko*, 237 Ill. 2d 490, 499, 931 N.E.2d 1198, 1204 (2010) ("issues that could have been raised on direct appeal but were not are forfeited."); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not raised in an appellant's opening brief are forfeited).

¶ 80    Defendant points out that he mentioned the jury question in his opening brief in the first appeal. In that brief, he did not argue that the court erred in its response to the jury question, only that the jury question should have alerted his trial counsel that the jury instruction was unclear. Although this is not precisely the argument raised in this appeal, we will not enforce a procedural default on this issue. See *People v. Sophanavong*, 2020 IL 124337, ¶ 21 ("forfeiture is a limitation on the parties and not the court").

¶ 81    Forfeiture notwithstanding, we find that the circuit court did not err in its response to the jury's question. "The task of a reviewing court is to determine whether the [jury] instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). Trial judges have discretion regarding how to answer questions from the jury. *People v. Childs*, 159 Ill. 2d 217, 228 (1994). In this case, the jury asked which order to render its murder and attempt murder verdicts. Defendant argues that this shows a misunderstanding on the part of the jury and contends that the court should have offered a substantive answer or at least sought to clarify the question. See *id.* at 229 ("If the question asked by the jury is unclear, it is the court's duty to seek clarification of it").

¶ 82    It is within the court's discretion  to decline to answer a jury question if the instructions are readily understandable and explained the relevant law. *People v. Averett*, 237 Ill. 2d 1, 24 (2010). As discussed above, there was no flaw with the jury instructions, so the court did not err in answering that the jury need only review the instructions and continue to deliberate.

¶ 83     Moreover, defendant cannot show any prejudice from the court's response. In the first place, defendant does not proffer any answer that the circuit court *should* have given. Because the overwhelming evidence showed that defendant was guilty of the murder of Frank Lucas and the attempted murder of Gloria Patterson, the order in which the jury rendered those verdicts was irrelevant. And, because this issue was not preserved at trial, it is only reviewable for plain error. As discussed above, the evidence was not closely balanced, so we would not reverse the circuit court on this issue under plain-error analysis even if the court had abused its discretion in its response to the jury question.

¶ 84                                    G. Sentence

¶ 85     Defendant's final contention is that his 81-year aggregate sentence is excessive. He argues that he should have received a more lenient sentence because he was convicted under a theory of accountability, his previous criminal record was nonviolent, and he showed potential for rehabilitation. He points out that the jury evidently did not believe that he had personally used a firearm during the shooting and contends that his strong family ties show that he has significant rehabilitative potential.

¶ 86     Once again, the State argues that this issue was forfeited when defendant failed to raise it in his first appeal. Defendant responds that this issue was properly preserved when he raised it in his post-trial motion. But this ignores that fact that, even if he did preserve in the first instance, he subsequently forfeited it by not raising it in his first appeal. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not raised in appellant's opening brief are forfeited). Although this court did not specifically address this issue in the first appeal—because it was not raised—it is clear that if it had, it would have found that the issue was forfeited by operation of Rule 341(h)(7).

Defendant makes no compelling argument why that forfeiture should be overlooked now, so we agree with the State that it has been forfeited.

¶ 87 Forfeiture notwithstanding, the court did not err in sentencing defendant. In imposing a sentence, the trial court must balance relevant factors, such as the nature of the offense, the protection of the public, and defendant's rehabilitative potential. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). The trial court has a superior opportunity to evaluate and weigh a defendant's credibility, demeanor, character, mental capacity, social environment, and habits. *Id.* In addition, a trial court is not required to expressly outline its reasoning for sentencing, and absent some affirmative indication to the contrary (other than the sentence itself), we must presume that the court considered all mitigating factors in the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011). Since the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, and the presence of mitigating factors neither requires a minimum sentence nor precludes a maximum sentence. *Alexander*, 239 Ill. 2d at 214. A sentence within statutory limits is reviewed for an abuse of discretion, and we may only alter such a sentence when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* at 212. So long as the trial court does not ignore pertinent mitigating factors or consider either incompetent evidence or improper aggravating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range. *Perkins*, 408 Ill. App. 3d at 762-63. This broad latitude means that this court cannot substitute its judgment simply because it might have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13.

¶ 88 First degree murder is punishable by 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a)(1) (West 2008). Attempt first degree murder is punishable by a prison term of 6 to 30

years. 720 ILCS 5/8-4(c)(1)(West 2008); ("the sentence for attempt to commit first degree murder is the sentence for a Class X felony"); 730 ILCS 5/5-4.5-25(a)(West 2008) (sentence for Class X felony is 6 to 30 years' imprisonment). Defendant's sentences of 54 years for first degree murder and 27 years for attempted first degree murder are within the respective statutory guidelines.

¶ 89    "[C]ourts in some cases may grant leniency in sentencing to offenders guilty by accountability." *People v. Miller*, 202 Ill. 2d 328, 342 (2002). However, those convicted of crimes under a theory of accountability "are equally responsible for the consequences of" the criminal acts. *Id.*; 720 ILCS 5/5-2 (West 2008). Consequently, defendant is not entitled to a lighter sentence merely because he was convicted under a theory of accountability.

¶ 90    The State points out that defendant was on mandatory supervised release at the time of the offenses and that he had a substantial criminal history. He had an earlier conviction for unlawful possession of a firearm and had received prison sentences for delivery of a controlled substance, unlawful use of a weapon, and obstruction of justice. The State also points out that the circuit court specifically stated that it had considered all of the evidence offered in aggravation and mitigation, and commented on defendant's rehabilitative potential when it stated, "Six felony convictions in my view, [defendant], despite what you've said now, doesn't really indicate to me any willingness or any intent on your part to change." Given this record and our deferential standard of review, we cannot say that the court erred in sentencing defendant to an aggregate sentence of 81 years' imprisonment, 9 years short of the statutory maximum.

¶ 91                                    CONCLUSION

¶ 92    For these reasons, we affirm defendant's convictions and sentence.

¶ 93    Affirmed.